UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 99-2443(L)
(CA-98-636-2)

Patricia Bragg, et al.,

Plaintiffs - Appellees,

versus

West Virginia Coal Association, et al.,

Intervenors/Defendants - Appellants.


O R D E R


The  court  further  amends  its  opinion  filed  April  24  and amended May 1, 2001, as follows:

On page 39, first full paragraph, line 31 -- the spelling of Justice Frankfurter's name is corrected.

For the Court - By Direction


/s/ Patricia S. Connor
Clerk

Filed: May 1, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

Nos. 99-2443(L)
(CA-98-636-2)

_____

Patricia Bragg, et al.,

Plaintiffs - Appellees,

versus

West Virginia Coal Association, et al.,

Intervenors/Defendants - Appellants.

_____

O R D E R

_____

The court amends its opinion filed April 24, 2001, as follows:

On page 29, first full paragraph, line 3 -- the citation to

Coeur d'Alene Tribe is corrected to read "521 U.S. at 270-80."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

PATRICIA BRAGG; JAMES W.
WEEKLEY; SIBBY R. WEEKLEY; WEST
VIRGINIA HIGHLANDS CONSERVANCY;
CARLOS GORE; LINDA GORE; CHERYL
PRICE; JERRY METHENA,
Plaintiffs-Appellees,

and

TOMMY MOORE; VICTORIA MOORE,
Plaintiffs,

v.

WEST VIRGINIA COAL ASSOCIATION;
WEST VIRGINIA MINING AND
RECLAMATION ASSOCIATION,

Intervenors/Defendants-
Appellants,

No. 99-2443

and

DANA ROBERTSON, Colonel, District
Engineer, U.S. Army Corps of
Engineers, Huntington District; JOE
N. BALLARD, Lieutenant General,
Chief of Engineers and Commander
of the U.S. Army Corps of
Engineers; MICHAEL D. GHEEN,
Chief to the Regulatory Branch,
Operations and Readiness Division,
U.S. Army Corps of Engineers,

Huntington District; MICHAEL C.
CASTLE, Director, West Virginia
Division of Environmental
Protection,
<u>Defendants,</u>

and

HOBET MINING, INCORPORATED;
CATENARY COAL COMPANY; MINGO-
LOGAN COAL COMPANY; WESTERN
POCAHONTAS PROPERTIES LIMITED
PARTNERSHIP; NATIONAL COUNCIL OF
COAL LESSORS, INCORPORATED;
INTERNATIONAL UNION, UNITED MINE
WORKERS OF AMERICA,
<u>Intervenors/Defendants.</u>

NATIONAL MINING ASSOCIATION; AEI
RESOURCES, INC.; WASHINGTON LEGAL
FOUNDATION; ALLIED EDUCATIONAL
FOUNDATION; INTERSTATE MINING
COMPACT COMMISSION;
COMMONWEALTH OF VIRGINIA;
FRIENDS OF THE EARTH; KENTUCKY
RESOURCES COUNCIL, INC.,
<u>Amici Curiae.</u>

PATRICIA BRAGG; JAMES W.
WEEKLEY; SIBBY R. WEEKLEY; WEST
VIRGINIA HIGHLANDS CONSERVANCY;
CARLOS GORE; LINDA GORE; CHERYL
PRICE; JERRY METHENA,
Plaintiffs-Appellees,

and

TOMMY MOORE; VICTORIA MOORE,
Plaintiffs,

v.

WESTERN POCAHONTAS PROPERTIES
LIMITED PARTNERSHIP; NATIONAL
COUNCIL OF COAL LESSORS,
INCORPORATED,
Intervenors/Defendants-
Appellants,

and

DANA ROBERTSON, Colonel, District
Engineer, U.S. Army Corps of
Engineers, Huntington District; JOE
N. BALLARD, Lieutenant General,
Chief of Engineers and Commander
of the U.S. Army Corps of
Engineers; MICHAEL D. GHEEN,
Chief of the Regulatory Branch,
Operations and Readiness Division,
U.S. Army Corps of Engineers,
Huntington District; MICHAEL C.
CASTLE, Director, West Virginia
Division of Environmental
Protection,
Defendants,

and

No. 99-2445

3

WEST VIRGINIA COAL ASSOCIATION;
WEST VIRGINIA MINING  AND
RECLAMATION ASSOCIATION; HOBET
MINING, INCORPORATED; CATENARY
COAL COMPANY; MINGO-LOGAN COAL
COMPANY; INTERNATIONAL UNION,
UNITED MINE WORKERS  OF AMERICA,
<u>Intervenors/Defendants.</u>

NATIONAL MINING ASSOCIATION; AEI
RESOURCES, INC.; WASHINGTON LEGAL
FOUNDATION; ALLIED EDUCATIONAL
FOUNDATION; INTERSTATE MINING
COMPACT COMMISSION;
COMMONWEALTH OF VIRGINIA;
FRIENDS OF THE EARTH; KENTUCKY
RESOURCES COUNCIL, INC.,
<u>Amici Curiae.</u>

4

PATRICIA BRAGG; JAMES W.
WEEKLEY; SIBBY R. WEEKLEY; WEST
VIRGINIA HIGHLANDS CONSERVANCY;
CARLOS GORE; LINDA GORE; CHERYL
PRICE; JERRY METHENA,
Plaintiffs-Appellees,

and

TOMMY MOORE; VICTORIA MOORE,
Plaintiffs,

v.

MICHAEL C. CASTLE, Director, West
Virginia Division of Environmental
Protection,
Defendant-Appellant,

and

DANA ROBERTSON, Colonel, District
Engineer, U.S. Army Corps of
Engineers, Huntington District; JOE
N. BALLARD, Lieutenant General,
Chief of Engineers and Commander
of the U.S. Army Corps of
Engineers; MICHAEL D. GHEEN,
Chief of the Regulatory Branch,
Operations and Readiness Division,
U.S. Army Corps of Engineers,
Huntington District,
Defendants,

and

No. 99-2446

5

WEST VIRGINIA COAL ASSOCIATION;
WEST VIRGINIA MINING  AND
RECLAMATION ASSOCIATION; HOBET
MINING, INCORPORATED; CATENARY
COAL COMPANY; MINGO-LOGAN COAL
COMPANY; WESTERN POCAHONTAS
PROPERTIES LIMITED PARTNERSHIP;
NATIONAL COUNCIL OF COAL LESSORS,
INCORPORATED; INTERNATIONAL UNION,
UNITED MINE WORKERS  OF AMERICA,
<u>Intervenors/Defendants.</u>

NATIONAL MINING ASSOCIATION; AEI
RESOURCES, INC.; WASHINGTON LEGAL
FOUNDATION; ALLIED EDUCATIONAL
FOUNDATION; INTERSTATE MINING
COMPACT COMMISSION;
COMMONWEALTH OF VIRGINIA;
FRIENDS OF THE EARTH; KENTUCKY
RESOURCES COUNCIL, INC.,
<u>Amici Curiae.</u>

6

PATRICIA BRAGG; JAMES W.
WEEKLEY; SIBBY R. WEEKLEY; WEST
VIRGINIA HIGHLANDS CONSERVANCY;
CARLOS GORE; LINDA GORE; CHERYL
PRICE; JERRY METHENA,
Plaintiffs-Appellees,

and

TOMMY MOORE; VICTORIA MOORE,
Plaintiffs,

v.

INTERNATIONAL UNION, UNITED MINE
WORKERS OF AMERICA,
Intervenor/Defendant-
Appellant,

and

No. 99-2447

DANA ROBERTSON, Colonel, District
Engineer, U.S. Army Corps of
Engineers, Huntington District; JOE
N. BALLARD, Lieutenant General,
Chief of Engineers and Commander
of the U.S. Army Corps of
Engineers; MICHAEL D. GHEEN,
Chief of the Regulatory Branch,
Operations and Readiness Division,
U.S. Army Corps of Engineers,
Huntington District; MICHAEL C.
CASTLE, Director, West Virginia
Division of Environmental
Protection,
Defendants,

and

7

WEST VIRGINIA COAL ASSOCIATION; WEST VIRGINIA MINING  AND RECLAMATION ASSOCIATION; HOBET MINING, INCORPORATED; CATENARY COAL COMPANY; MINGO-LOGAN COAL COMPANY; WESTERN POCAHONTAS PROPERTIES LIMITED PARTNERSHIP; NATIONAL COUNCIL OF COAL LESSORS, INCORPORATED,

Intervenors/Defendants.

NATIONAL MINING ASSOCIATION; AEI RESOURCES, INC.; WASHINGTON LEGAL FOUNDATION; ALLIED EDUCATIONAL FOUNDATION; INTERSTATE MINING COMPACT COMMISSION; COMMONWEALTH OF VIRGINIA; FRIENDS OF THE EARTH; KENTUCKY RESOURCES COUNCIL, INC.,

Amici Curiae.

PATRICIA BRAGG; JAMES W.
WEEKLEY; SIBBY R. WEEKLEY; WEST
VIRGINIA HIGHLANDS CONSERVANCY;
CARLOS GORE; LINDA GORE; CHERYL
PRICE; JERRY METHENA,
Plaintiffs-Appellees,

and

TOMMY MOORE; VICTORIA MOORE,
Plaintiffs,

v.

HOBET MINING, INCORPORATED;
CATENARY COAL COMPANY; MINGO-
LOGAN COAL COMPANY,
Intervenors/Defendants-
Appellants,

No. 99-2448

and

DANA ROBERTSON, Colonel, District
Engineer, U.S. Army Corps of
Engineers, Huntington District; JOE
N. BALLARD, Lieutenant General,
Chief of Engineers and Commander
of the U.S. Army Corps of
Engineers; MICHAEL D. GHEEN,
Chief of the Regulatory Branch,
Operations and Readiness Division,
U.S. Army Corps of Engineers,
Huntington District; MICHAEL C.
CASTLE, Director, West Virginia
Division of Environmental
Protection,
Defendants,

and

9

WEST VIRGINIA COAL ASSOCIATION;
WEST VIRGINIA MINING  AND
RECLAMATION ASSOCIATION; WESTERN
POCAHONTAS PROPERTIES LIMITED
PARTNERSHIP; NATIONAL COUNCIL OF
COAL LESSORS, INCORPORATED;
INTERNATIONAL UNION, UNITED MINE
WORKERS OF AMERICA,
<u>Intervenors/Defendants.</u>
NATIONAL MINING ASSOCIATION; AEI
RESOURCES, INC.; WASHINGTON LEGAL
FOUNDATION; ALLIED EDUCATIONAL
FOUNDATION; INTERSTATE MINING
COMPACT COMMISSION;
COMMONWEALTH OF VIRGINIA;
FRIENDS OF THE EARTH; KENTUCKY
RESOURCES COUNCIL, INC.,
<u>Amici Curiae.</u>

10

PATRICIA BRAGG; JAMES W.
WEEKLEY; SIBBY R. WEEKLEY; WEST
VIRGINIA HIGHLANDS CONSERVANCY;
CARLOS GORE; LINDA GORE; CHERYL
PRICE; JERRY METHENA,
Plaintiffs-Appellees,

and

TOMMY MOORE; VICTORIA MOORE,
Plaintiffs,

v.

DANA ROBERTSON, Colonel, District
Engineer, U.S. Army Corps of
Engineers, Huntington District; JOE
N. BALLARD, Lieutenant General,

Chief of Engineers and Commander
of the U.S. Army Corps of
Engineers; MICHAEL D. GHEEN,
Chief of the Regulatory Branch,
Operations and Readiness Division,
U.S. Army Corps of Engineers,
Huntington District,
Defendants-Appellants,

and

MICHAEL C. CASTLE, Director, West
Virginia Division of Environmental
Protection,
Defendant,

and

No. 99-2683

11

WEST VIRGINIA COAL ASSOCIATION;
WEST VIRGINIA MINING  AND
RECLAMATION ASSOCIATION; HOBET
MINING, INCORPORATED; CATENARY
COAL COMPANY; MINGO-LOGAN COAL
COMPANY; WESTERN POCAHONTAS
PROPERTIES LIMITED PARTNERSHIP;
NATIONAL COUNCIL OF COAL LESSORS,
INCORPORATED; INTERNATIONAL UNION,
UNITED MINE WORKERS  OF AMERICA,
Intervenors/Defendants.

NATIONAL MINING ASSOCIATION; AEI
RESOURCES, INC.; WASHINGTON LEGAL
FOUNDATION; ALLIED EDUCATIONAL
FOUNDATION; INTERSTATE MINING
COMPACT COMMISSION;
COMMONWEALTH OF VIRGINIA;
FRIENDS OF THE EARTH; KENTUCKY
RESOURCES COUNCIL, INC.,
Amici Curiae.

12

PATRICIA BRAGG; JAMES W.
WEEKLEY; SIBBY R. WEEKLEY; WEST
VIRGINIA HIGHLANDS CONSERVANCY;
CARLOS GORE; LINDA GORE; CHERYL
PRICE; JERRY METHENA,
Plaintiffs-Appellees,

and

TOMMY MOORE; VICTORIA MOORE,
Plaintiffs,

v.

WEST VIRGINIA COAL ASSOCIATION;
WEST VIRGINIA MINING  AND
RECLAMATION ASSOCIATION,
Intervenors/Defendants-
Appellants,

v.

MICHAEL C. CASTLE, Director, West
Virginia Division of Environmental
Protection,
Defendant-Appellee,

and

No. 00-1338

DANA ROBERTSON, Colonel, District
Engineer, U.S. Army Corps of
Engineers, Huntington District; JOE
N. BALLARD, Lieutenant General,
Chief of Engineers and Commander
of the U.S. Army Corps of
Engineers; MICHAEL D. GHEEN,
Chief of the Regulatory Branch,
Operations and Readiness Division,
U.S. Army Corps of Engineers,
Huntington District,
<u>Defendants,</u>

and

HOBET MINING, INCORPORATED;
CATENARY COAL COMPANY; MINGO-
LOGAN COAL COMPANY; WESTERN
POCAHONTAS PROPERTIES LIMITED
PARTNERSHIP; NATIONAL COUNCIL OF
COAL LESSORS, INCORPORATED;
INTERNATIONAL UNION, UNITED MINE
WORKERS OF AMERICA,
<u>Intervenors/Defendants.</u>

NATIONAL MINING ASSOCIATION; AEI
RESOURCES, INC.; WASHINGTON LEGAL
FOUNDATION; ALLIED EDUCATIONAL
FOUNDATION; INTERSTATE MINING
COMPACT COMMISSION;
COMMONWEALTH OF VIRGINIA;
FRIENDS OF THE EARTH; KENTUCKY
RESOURCES COUNCIL, INC.,
<u>Amici Curiae.</u>

14

PATRICIA BRAGG; JAMES W. WEEKLEY; SIBBY R. WEEKLEY; WEST VIRGINIA HIGHLANDS CONSERVANCY; CARLOS GORE; LINDA GORE; CHERYL PRICE; JERRY METHENA,
Plaintiffs-Appellees,

and

TOMMY MOORE; VICTORIA MOORE,
Plaintiffs,

v.

HOBET MINING, INCORPORATED; CATENARY COAL COMPANY; MINGO-LOGAN COAL COMPANY,
Intervenors/Defendants-Appellants,

v.

MICHAEL C. CASTLE, Director, West Virginia Division of Environmental Protection,
Defendant-Appellee,

and

DANA ROBERTSON, Colonel, District Engineer, U.S. Army Corps of Engineers, Huntington District; JOE N. BALLARD, Lieutenant General, Chief of Engineers and Commander of the U.S. Army Corps of Engineers; MICHAEL D. GHEEN, Chief of the Regulatory Branch,

No. 00-1339

15

Operations and Readiness Division,
U.S. Army Corps of Engineers,
Huntington District,
<u>Defendants,</u>

and

WEST VIRGINIA COAL ASSOCIATION;
WEST VIRGINIA MINING  AND
RECLAMATION ASSOCIATION; WESTERN
POCAHONTAS PROPERTIES LIMITED
PARTNERSHIP; NATIONAL COUNCIL OF
COAL LESSORS, INCORPORATED;
INTERNATIONAL UNION, UNITED MINE
WORKERS OF AMERICA,
<u>Intervenors/Defendants.</u>

NATIONAL MINING ASSOCIATION; AEI
RESOURCES, INC.; WASHINGTON LEGAL
FOUNDATION; ALLIED EDUCATIONAL
FOUNDATION; INTERSTATE MINING
COMPACT COMMISSION;
COMMONWEALTH OF VIRGINIA;
FRIENDS OF THE EARTH; KENTUCKY
RESOURCES COUNCIL, INC.,
<u>Amici Curiae.</u>

Appeals from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, Chief District Judge.
(CA-98-636-2)

Argued: December 7, 2000

Decided: April 24, 2001

Before NIEMEYER, LUTTIG, and WILLIAMS, Circuit Judges.

_____

16

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge Niemeyer wrote the opinion, in which Judge Luttig and Judge Williams joined.

_____

## COUNSEL

**ARGUED:** Benjamin Lee Bailey, BAILEY & GLASSER, L.L.P., Charleston, West Virginia; R. Hewitt Pate, HUNTON & WILLIAMS, Richmond, Virginia; Jared A. Goldstein, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUS-TICE, Washington, D.C., for Appellants. Joseph Mark Lovett, MOUNTAIN STATE JUSTICE, INC., Charleston, West Virginia; James Millard Hecker, TRIAL LAWYERS FOR PUBLIC JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Brian A. Glasser, Jennifer S. Fahey, BAILEY & GLASSER, L.L.P., Charleston, West Virginia; Russell M. Hunter, Office of Mining & Reclamation, WEST VIRGINIA DIVISION OF ENVIRONMENT PROTECTION, Nitro, West Virginia, for Appellant Castle. Michael R. Shebelskie, HUN-TON & WILLIAMS, Richmond, Virginia; W. Warren Upton, James R. Snyder, Robert G. McLusky, JACKSON & KELLY, P.L.L.C., Charleston, West Virginia; Jim Haviland, Perry McDaniel, CRAN-DALL, PYLES, HAVILAND & TURNER, Charleston, West Virginia; Robert D. Pollitt, STEPTOE & JOHNSON, Charleston, West Virginia, for Appellants West Virginia Coal, et al. Lois J. Schiffer, Assistant Attorney General, Steven E. Rusak, David C. Shilton, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Gary S. Guzy, General Counsel, Steven Neugeboren, ENVIRONMENTAL PRO-TECTION AGENCY, Washington, D.C.; John D. Leshy, Solicitor, Thomas Bovard, DEPARTMENT OF THE INTERIOR, Washington, D.C.; Charles A. Blanchard, General Counsel, Earl Stockdale, Deputy General Counsel, Diedre Duncan, DEPARTMENT OF THE ARMY, Washington, D.C., for Federal Appellants. Patrick C. McGinley, Morgantown, West Virginia; Suzanne M. Weise, Morgantown, West Virginia, for Appellees. Harold P. Quinn, Jr., Senior Vice President & General Counsel, NATIONAL MINING ASSOCIATION, Washington, D.C.; George W. Miller, John G. Roberts, Jr., Susan M. Cook, HOGAN & HARTSON, L.L.P., Washington, D.C., for Amicus

17

Curiae National Mining. Sheryl G. Snyder, Timothy J. Hagerty, BROWN, TODD & HEYBURN, P.L.L.C., Louisville, Kentucky; Paul E. Sullivan, BROWN, TODD & HEYBURN, P.L.L.C., Lexington, Kentucky, for Amicus Curiae AEI. Daniel J. Popeo, Paul D. Kamenar, WASHINGTON LEGAL FOUNDATION, Washington, D.C., for Amici Curiae Washington Legal, et al. Christopher B. Power, David L. Yaussy, ROBINSON & MCELWEE, L.L.P., Charleston, West Virginia; Gregory E. Conrad, INTERSTATE MINING COMPACT COMMISSION, Herndon, Virginia, for Amicus Curiae Interstate Mining. Mark L. Earley, Attorney General of Virginia, William H. Hurd, Solicitor General, Judith Williams Jagdmann, Deputy Attorney General, Richard B. Zorn, Senior Assistant Attorney General, Valerie L. Myers, Assistant Attorney General, John C. Wilkinson, Jr., Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Amicus Curiae Commonwealth. David S. Baron, EARTHJUSTICE LEGAL DEFENSE FUND, Washington, D.C., for Amicus Curiae Friends. Tom FitzGerald, Frankfort, Kentucky, for Amicus Curiae Kentucky Resources.

_____

## OPINION

NIEMEYER, Circuit Judge:

This case, which is of great importance to the citizens of West Virginia, was commenced by some of its citizens and an environmental group against the Director of the West Virginia Division of Environmental Protection to challenge his issuance of permits for mountaintop-removal coal mining in the State. The complaint alleged that the Director "has routinely approved surface coal mining permits which decapitate the State's mountains and dump the resulting waste in nearby valleys, burying hundreds of miles of headwaters of West Virginia's streams," and it requested an injunction prohibiting the further issuance of such permits.

The public concern over this issue is demonstrated by the remarkably broad spectrum of interests represented in these proceedings, as well as by their unusual alliances, in both the political and legal are-

18

nas. On one side of the dispute are plaintiffs, consisting of a group of private citizens and environmental groups who oppose West Virginia's current permitting practices, and they enjoy the support of the U.S. Environmental Protection Agency. On the other side are the coal mining companies, who are allied with the United Mine Workers of America and the West Virginia State political establishment, all of whom favor current mining practices. And, until this litigation was commenced, these practices had the approval of the U.S. Army Corps of Engineers, although the United States' interests are now aligned with the position taken by the U.S. Environmental Protection Agency.

Following extensive and careful consideration of motions for summary judgment on the substantive issues presented and cross-motions to dismiss, the district court denied the motions to dismiss, found that West Virginia's approval of mountaintop mining practices violated both federal and State law, and enjoined the State from issuing further permits that authorize dumping of mountain rock within 100 feet of intermittent and perennial streams.

Because we conclude that the doctrine of sovereign immunity bars the citizens from bringing their claims against an official of West Virginia in federal court, we vacate the district court's injunction and remand with instructions to dismiss the citizens' complaint without prejudice so that they may present their claims in the proper forum. We affirm, however, the district court's earlier consent decree approving a settlement of some of the claims asserted. The reasons for our rulings follow.

I

Mountaintop-removal coal mining, while not new, only became widespread in West Virginia in the 1990s. Under this method, to reach horizontal seams of coal layered in mountains, the mountaintop rock above the seam is removed and placed in adjacent valleys; the coal is extracted; and the removed rock is then replaced in an effort to achieve the original contour of the mountain. But because rock taken from its natural state and broken up naturally "swells," perhaps by as much as 15 to 25%, the excess rock not returned to the mountain -- the "overburden" -- remains in the valleys, creating "valley fills." Many valley fills bury intermittent and perennial streams and

drainage areas that are near the mountaintop. Over the years, the West Virginia Director of Environmental Protection (the "Director" or "State Director"), as well as the U.S. Army Corps of Engineers, has approved this method of coal mining in West Virginia.

The disruption to the immediate environment created by mountain-top mining is considerable and has provoked sharp differences of opinion between environmentalists and industry players. See, e.g., Penny Loeb, Shear Madness, U.S. News & World Rept., Aug. 11, 1997. As Loeb reported these differences of opinion, environmentalists decry the "startling" change in the topography, which leaves the land more subject to floods, results in the pollution of streams and rivers, and has an "incalculable" impact on wildlife. The environmentalists also criticize the mining process itself, which cracks foundations of nearby houses, causes fires, creates dust and noise, and disrupts private wells. The coal companies concede that the process changes the landscape, but note on the positive side that land is reclaimed, that grass, small shrubs, and trees are planted, and that waterfowl ponds are added. Moreover, the companies observe that mining is critical to the West Virginia economy and creates high-paying jobs in the State.

In July 1998, Patricia Bragg, along with eight other West Virginia citizens and the West Virginia Highlands Conservancy (collectively "Bragg"), commenced this action against officials of the U.S. Army Corps of Engineers and the State Director. Bragg alleged that the State Director, in granting surface coal mining permits, "engaged in an ongoing pattern and practice of violating his non-discretionary duties under the Surface Mining Control and Reclamation Act [of 1977, 30 U.S.C. § 1201 et seq.] and the West Virginia state program approved under that statute." More particularly, she alleged that the Director consistently issued permits to mining operations, without making requisite findings, that (1) authorized valley fills, (2) failed to assure the restoration of original mountain contours, and (3) violated other environmental protection laws. She asserted that the Director violated his federal- and State-law duty to "withhold approval of permit applications that are not complete and accurate and in compliance with all requirements of the state program." She also alleged that the Corps of Engineers breached its duties under federal law.

The Director moved to dismiss the complaint, asserting that Bragg's claims were barred by the Eleventh Amendment and that the

20

court, in any case, lacked subject matter jurisdiction. He argued that although only injunctive relief and declaratory judgments against him in his official capacity were sought, the Ex parte Young exception to Eleventh Amendment immunity did not apply because Bragg's claims arose under State law. The district court disagreed and permitted Bragg's suit to proceed against the Director.

All but two counts of the complaint were settled,[1] and the court resolved Counts 2 and 3 on motions for summary judgment. Both of these counts addressed a West Virginia regulation, enacted to conform with a federal regulation, that established 100-foot "buffer zones" around "perennial" and "intermittent" streams, within which surface mining activities may not disturb the land, unless the State agency "specifically authorizes" such activities after making certain findings. W. Va. Code St. R. tit. 38 § 2-5.2; see also 30 C.F.R. § 816.57 (the federal counterpart).[2] Count 2 alleged that the Director

_____

[1] The counts of the complaint directed against the U.S. Army Corps of Engineers for violation of the Clean Water Act, 33 U.S.C. § 1251 et seq., the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and the Administrative Procedure Act, 5 U.S.C. § 501 et seq., were settled on December 23, 1998, and the district court approved the settlement as "fair, adequate, reasonable, and faithful to the [applicable] environmental statutes." Bragg v. Robertson, 54 F. Supp. 2d 653, 670 (S.D. W. Va. 1999). The counts directed against the State Director, except for Counts 2 and 3, were settled on July 26, 1999, and the court approved that settlement by entry of a consent decree, dated February 17, 2000. See Bragg v. Robertson, 83 F. Supp. 2d 713, 722 (S.D. W. Va. 2000). The coal companies and associations, but not the Director, have appealed the consent decree, asserting that the court did not have jurisdiction over the State Director because (1) 30 U.S.C. § 1270(a)(2) did not provide jurisdiction, and (2) the Eleventh Amendment barred the action against the Director.

[2] W. Va. Code St. R. tit. 38 § 2-5.2 states

No land within one hundred feet (100') of an intermittent or perennial stream shall be disturbed by surface mining operations including roads unless specifically authorized by the Director. The Director will authorize such operations only upon finding that surface mining activities will not adversely affect the normal flow or gradient of the stream, adversely affect fish migration or

21

engaged in a pattern and practice of approving mountaintop removal operations without even attempting to make the required findings, and Count 3 alleged that because valley fills inherently have an adverse effect upon stream ecology and cause violations of water quality standards, the findings required by the State regulation could never be made, at least not accurately, for valley fill permits. In entering summary judgment in favor of Bragg, the district court ruled (1) that "the Director has a nondiscretionary duty to make the findings required under the buffer zone rule before authorizing any incursions, including valley fills, within one hundred feet of an intermittent or perennial stream," Bragg v. Robertson, 72 F. Supp. 2d 642, 661 (S.D. W. Va. 1999); and (2) that "the Director has a nondiscretionary duty under the buffer zone rule to deny variances for valley fills in intermittent and perennial streams because they necessarily adversely affect stream flow, stream gradient, fish migration, related environmental values, water quality and quantity, and violate state and federal water quality standards," id. at 663. Based on these rulings, the court enjoined the Director "from approving any further surface mining permits under current law that would authorize placement of excess spoil in intermittent and perennial streams for the primary purpose of waste disposal." Id. The district court stayed its injunction, however, pending appeal to this court. See Bragg v. Robertson, 190 F.R.D. 194, 196 (S.D. W. Va. 1999).

The State Director appealed, challenging not only the district court's substantive rulings on Counts 2 and 3, but also its rulings that the Eleventh Amendment did not bar this suit against him and that the federal court had jurisdiction to consider Bragg's claims. Coal mining companies and coal associations, that had intervened in the case, also appealed, again contesting the district court's substantive rulings on Counts 2 and 3 and challenging the district court's jurisdiction both to enter the injunction and to enter the February 17, 2000 consent decree approving the settlement of the other claims against the Direc-

_____

related environmental values, materially damage the water quantity or quality of the stream and will not cause or contribute to violations of applicable State or Federal water quality standards. The area not to be disturbed shall be designated a buffer zone and marked accordingly.

22

tor. Finally, the United States appealed, challenging the breadth of the district court's injunction.

II

The Surface Mining Control and Reclamation Act of 1977 ("SMCRA") was enacted to strike a balance between the nation's interests in protecting the environment from the adverse effects of surface coal mining and in assuring the coal supply essential to the nation's energy requirements. See 30 U.S.C. § 1202(a), (d), (f); see also Hodel v. Va. Mining & Reclamation Ass'n, 452 U.S. 264, 268-69 (1981). The Act accomplishes these purposes through a "cooperative federalism," in which responsibility for the regulation of surface coal mining in the United States is shared between the U.S. Secretary of the Interior and State regulatory authorities. See H.R. Rep. No. 95-218, at 57 (1977) (hereinafter "Legislative History"), reprinted in 1977 U.S.C.C.A.N. 593, 595. Under this scheme, Congress established in SMCRA "minimum national standards" for regulating surface coal mining and encouraged the States, through an offer of exclusive regulatory jurisdiction, to enact their own laws incorporating these minimum standards, as well as any more stringent, but not inconsistent, standards that they might choose. See Legislative History, at 167, reprinted in 1977 U.S.C.C.A.N. at 698; 30 U.S.C. § 1255(b).

To implement this cooperative federalism, SMCRA directs the U.S. Secretary of the Interior to develop a "federal program" of regulation that embodies the minimum national standards and to consider for approval any "State programs" that are submitted to it for approval. To obtain approval of its program, a State must pass a law that provides for the minimum national standards established as "requirements" in SMCRA and must also demonstrate that it has the capability of enforcing its law. See 30 U.S.C. § 1253(a). Once the Secretary is satisfied that a State program meets these requirements and approves the program, the State's laws and regulations implementing the program become operative for the regulation of surface coal mining, and the State officials administer the program, see id. § 1252(e), giving the State "exclusive jurisdiction over the regulation of surface coal mining" within its borders, id. § 1253(a). If, however, a State fails to submit a program for approval, or a program that it

23

submits is not approved, or approval of a State's program is withdrawn because of ineffective enforcement, then the _federal_ program becomes applicable for the State, and the Secretary becomes vested with "exclusive jurisdiction for the regulation and control of surface coal mining and reclamation operations taking place [in the] State." _Id_. § 1254(a); _see also_ Legislative History, at 85-86, _reprinted in_ 1977 U.S.C.C.A.N. at 622.

Thus, SMCRA provides for _either_ State regulation of surface coal mining within its borders _or_ federal regulation, but not both. The Act expressly provides that one or the other is exclusive, _see_ 30 U.S.C. §§ 1253(a), 1254(a), with the exception that an approved State program is always subject to revocation when a State fails to enforce it, _see id_. §§ 1253(a); 1271(b). Federal oversight of an approved State program is provided by the Secretary's obligation to inspect and monitor the operations of State programs. _See id_. §§ 1267, 1271. Only if an approved State program is revoked, as provided in § 1271, however, does the _federal_ program become the operative regulation for surface coal mining in any State that has previously had its program approved. _See id_. §§ 1254(a), 1271.

In sum, because the regulation is mutually exclusive, either federal law or State law regulates coal mining activity in a State, but not both simultaneously. Thus, after a State enacts statutes and regulations that are approved by the Secretary, these statutes and regulations become operative, and the federal law and regulations, while continuing to provide the "blueprint" against which to evaluate the State's program, "drop out" as operative provisions. They are reengaged only following the instigation of a § 1271 enforcement proceeding by the Secretary of the Interior.

In the case before us, West Virginia submitted a program to the Secretary in 1980 for approval, and the Secretary approved the program in 1981, thus granting West Virginia "primacy" status -- a status under which its law exclusively regulates coal mining in the State. _See_ 30 C.F.R. § 948.10 (noting the Secretary's approval of West Virginia's plan). As part of this program, the West Virginia legislature enacted its own statute entitled the "Surface Coal Mining and Reclamation Act" (the "West Virginia Coal Mining Act"). _See_ W. Va. Code § 22-3-1 _et seq_. As amended, the West Virginia Coal Mining Act

24

vests the Director of the State Division of Environmental Protection with the authority to administer the Act and otherwise to provide for the regulation of surface coal mining within the State. See W. Va. Code § 22-3-4. The West Virginia Act sets out minimum performance standards that mirror those found in SMCRA, and the State Director has exercised his statutorily granted power to promulgate State regulations that parallel those issued by the Secretary of the Interior pursuant to the federal Act. See 38 W. Va. Code St. R. § 2-1 et seq. Thus, since the Secretary's approval of the West Virginia program in 1981, the Director has served as the exclusive permitting authority in the State, and West Virginia has maintained "exclusive jurisdiction," with certain exceptions inherent in the federal oversight provisions, over surface mining regulation within its borders.

III

Bragg brought this action against the State Director under the "citizen suit" provision of SMCRA, which provides in relevant part:

> [A]ny person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter --
>
> * * *
>
> (2) against the Secretary or the appropriate State regulatory authority to the extent permitted by the eleventh amendment to the Constitution where there is alleged a failure of the Secretary or the appropriate State regulatory authority to perform any act or duty under this chapter which is not discretionary with the Secretary or with the appropriate State regulatory authority.
>
> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties.

30 U.S.C. § 1270(a)(2).

The State Director asserted below and now contends that, as an

25

official of West Virginia who has been sued in his official capacity, he is immune from suit in federal court under the doctrine of sovereign immunity guaranteed by the Eleventh Amendment. In response to the district court's reliance on Ex parte Young, 209 U.S. 123 (1908), to overcome the Eleventh Amendment bar, the Director argues that the Ex parte Young exception does not apply because the issues in this case involve enforcement of West Virginia law, not federal law. Acknowledging that Bragg nominally asserts violations of both federal and State law, the Director argues that Bragg actually seeks to compel the Director "to comply with the approved West Virginia surface mining program" because once a State program is approved by the Secretary of the Interior, it is State law, not federal law, that governs. Thus, the Director concludes that the Ex parte Young exception for ongoing federal violations does not apply; rather, Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984), controls. In Pennhurst, the Supreme Court held the Ex parte Young doctrine inapplicable to a suit brought against a State official to compel his compliance with State law. See 465 U.S. at 106.**3**

_____

**3** In addition, the State Director argues that SMCRA provides Bragg a detailed remedial scheme and that a court should not cast aside that scheme to permit an action against a State officer based upon Ex parte Young. The Director details the scheme as follows:

> Under 30 U.S.C. § 1267, the Secretary [of the Interior] retains authority to make "such inspections of any surface coal mining and reclamation operations as are necessary to evaluate the administration of approved State program." SMCRA's regulations contain procedures for making any amendments to the State programs that OSM determines are necessary. 30 C.F.R. part 732. The regulations also prescribe a detailed process for discontinuing state programs that do not continue to meet SMCRA's minimum standards. 30 C.F.R. part 733. This detailed, remedial scheme protects SMCRA's minimum nationwide standards, while preserving the states' vital Eleventh Amendment rights.

He grounds this argument on the Supreme Court's decision in Seminole Tribe v. Florida, 517 U.S. 44, 53 (1996). Bragg, on the other hand, asserts that her suit is not displacing a statutorily created scheme but rather is "completely consistent with, and expressly authorized by, SMCRA's legislative scheme." Because we dispose of this case on other grounds, we do not address this argument.

26

Bragg, on the other hand, contends that the Ex parte Young exception permits suit against the State Director. She argues first that Congress, by enacting 30 U.S.C. § 1270(a)(2), "authorized citizens to bring Ex parte Young suits against State officials who have the responsibility to comply with SMCRA and federally-approved State programs under that Act." Second, she asserts that her suit seeks to enforce federal, not State, law because (1) States with federally approved programs are still bound by federal statutory mandates that govern their activities, and (2) the buffer zone regulation promulgated by West Virginia is federal law. Finally, she maintains that West Virginia, in choosing "to submit a state program for federal approval, accept[ed] the federal government's invitation to act as regulators of surface coal mining in the state." She asserts that West Virginia, by participating in the federal program, agreed to submit to federal jurisdiction under 30 U.S.C. § 1270(a)(2), thereby waiving its Eleventh Amendment immunity.

The district court ruled that SMCRA's grant to citizens to bring suits against State regulatory authorities "to the extent permitted by the eleventh amendment," 30 U.S.C. § 1270(a)(2), amounts to an "implicit authorization" to citizens to bring Ex parte Young actions against State officials, and cited Natural Resources Defense Council v. California Department of Transportation, 96 F.3d 420, 423-24 (9th Cir. 1996), for support. The court also rejected the Director's argument that State law, not federal law, is being enforced because the State law is incorporated into federal law, and cited Arkansas v. Oklahoma, 503 U.S. 91, 110 (1992), for support. See Bragg v. Robertson, No. 2:98-0636, slip op. at 8 (S.D. W. Va. Oct. 9, 1998).

We begin our analysis by noting that although the literal text of the Eleventh Amendment appears to restrict only Article III diversity jurisdiction, we have come to understand that the Amendment confirms principles of State sovereign immunity that are embedded in the constitutional structure and thus that it bars "citizens from bringing suits in federal court against their own states." Litman v. George Mason Univ., 186 F.3d 544, 549 (4th Cir. 1999) (citing Hans v. Louisiana, 134 U.S. 1 (1890)); see also Alden v. Maine, 527 U.S. 706, 712 (1999) (holding that sovereign immunity also immunizes a State from private lawsuits brought in its own courts under federal law). And when, as in this case, a suit is brought only against State officials, the

27

suit is barred "when `the State is the real, substantial party in interest.'" Pennhurst, 465 U.S. at 101 (quoting Ford Motor Co. v. Dep't of Treasury of Ind., 323 U.S. 459, 464 (1945)). This limit on federal judicial power is an essential element of the constitutional design, as immunity "accords the States the respect owed them as members of the federation," Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc., 506 U.S. 139, 146 (1993), and protects the States' ability "to govern in accordance with the will of their citizens," Alden, 527 U.S. at 751.

A State's immunity to suit in federal court is subject to well established and important exceptions, however. See S.C. State Ports Auth. v. Fed. Maritime Comm'n, No. 00-1481, ___ F.3d ___, (4th Cir. Mar. 12, 2001) (enumerating six exceptions to Eleventh Amendment immunity). Sovereign immunity does not, for example, prevent the United States itself from bringing suit against an unconsenting State to ensure compliance with federal law. See United States v. Texas, 143 U.S. 621, 644-45 (1892). Moreover, Congress may abrogate a State's immunity pursuant to its enforcement power under § 5 of the Fourteenth Amendment. See Seminole Tribe, 517 U.S. at 59; Fla. Prepaid Post Secondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627, 647 (1999) (holding that the Patent Remedy Act was not a § 5 enactment). A State, of course, may waive its immunity by "consenting to be sued in federal court." Litman, 186 F.3d at 550 (citing Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999)); see also Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 267 (1997); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985). And, as at issue here, the Eleventh Amendment does not preclude private individuals from bringing suit against State officials for prospective injunctive or declaratory relief designed to remedy ongoing violations of federal law. See Ex parte Young, 209 U.S. 123 (1908); DeBauche v. Trani, 191 F.3d 499, 505 (4th Cir. 1999) (citing Green v. Mansour, 474 U.S. 64, 68 (1985)).

Bragg concedes that her suit is, in reality, directed toward the State of West Virginia and therefore that Eleventh Amendment jurisprudence is relevant. She maintains, however, that her suit is authorized by Ex parte Young, or, alternatively, that West Virginia has waived its immunity by participating in the federal program. We address each of these arguments in turn.

28

A

Although the Ex parte Young exception to the Eleventh Amendment is well established, its precise contours are not. See Pennhurst, 465 U.S. at 101-02; see also Coeur d'Alene Tribe, 521 U.S. at 270-80 (opinion of Kennedy, J., joined by Rehnquist, C.J.) (urging a "case-by-case approach" to the application of Ex parte Young). At the very least, however, the Ex parte Young doctrine provides that "a federal court has jurisdiction over a suit against a state officer to enjoin official actions that violate federal law, even if the State itself is immune from suit under the Eleventh Amendment." Id. at 288 (O'Connor, J., concurring in part and concurring in the judgment); see also Green, 474 U.S. at 68; Pennhurst, 465 U.S. at 102-03. The exception is premised upon the notion, sometimes called a "fiction," see, e.g., Coeur d'Alene Tribe, 521 U.S. at 281, that when a State officer violates federal law, he is stripped of his official character, thus losing the "cloak" of State immunity. See id. at 288 (O'Connor, J., concurring in part and concurring in the judgment); Pennhurst, 465 U.S. at 102; Ex parte Young, 209 U.S. at 159-60. Even though "the State itself will have a continuing interest in the litigation whenever State policies or procedures are at stake," Coeur d'Alene Tribe, 521 U.S. at 269; see also Gr. N. Life Ins. Co. v. Read, 322 U.S. 47, 51 (1944), a court decree enjoining a State officer from committing future violations of federal law generally will not upset the careful federal balance established by the Constitution and confirmed by the Eleventh Amendment. To preserve this balance, however, "we must ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law." Coeur d'Alene Tribe, 521 U.S. at 269.

But because this balance is a careful one indeed, the Supreme Court has strictly limited the application of the Ex parte Young doctrine to circumstances in which injunctive relief is necessary to "give[] life to the Supremacy Clause." Green, 474 U.S. at 68; see also Pennhurst, 465 U.S. at 105 (recognizing that "the need to promote the supremacy of federal law must be accommodated to the constitutional immunity of the States"). Thus, a federal court cannot order a State official to remedy past violations of federal law by paying funds out of the State treasury, given that such relief "is in practical effect indistinguishable . . . from an award of damages against the

29

State." <u>Edelman v. Jordan</u>, 415 U.S. 651, 668 (1974). And as "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law," sovereign immunity also bars a court's grant of any type of relief, whether retrospective or prospective, based upon a State official's violation of State law. <u>Pennhurst</u>, 465 U.S. at 106.

These exceptions demonstrate that application of the doctrine must entail more than "a reflexive reliance on an obvious fiction." <u>Coeur d'Alene Tribe</u>, 521 U.S. at 270. "[J]ust because a private citizen's federal suit seeks declaratory injunctive relief against State officials does not mean that it must automatically be allowed to proceed under an exception to the Eleventh Amendment protection." <u>Bell Atl. Md., Inc. v. MCI Worldcom, Inc.</u>, 240 F.3d 279, 294 (4th Cir. 2001). "Such `empty formalism' would improperly sacrifice the`real interests served by the Eleventh Amendment.'" <u>Id</u>. (quoting <u>Coeur d'Alene Tribe</u>, 521 U.S. at 270). Rather, just as the Court did in <u>Coeur d'Alene Tribe</u>, we must evaluate the degree to which a State's sovereign interest would be adversely affected by a federal suit seeking injunctive relief against State officials, as well as the extent to which <u>federal</u>, rather than State, law must be enforced to vindicate the federal interest.

The respective federal and State interests revealed in this case make the analysis complex because SMCRA was expressly designed to hand over to the States the task of enforcing minimum national standards for surface coal mining, providing only limited federal mechanisms to oversee State enforcement. Thus, because the federal enactment, in furtherance of its design to advance State interests, creates the potential for exclusive State regulatory authority, the federal interest would seem to be better served by encouraging private citizens to enforce their claims relating to the State enforcement efforts in State, rather than federal, court. A more precise evaluation of this interest, however, as it might affect application of <u>Ex parte Young</u>, requires us to return to the statutory structure of SMCRA and the methods by which it employs a cooperative federalism.

B

As we have noted, under SMCRA Congress intended to divide responsibility for the regulation of surface coal mining between the

30

federal government and the States. But characterizing the regulatory structure of SMCRA as "cooperative" federalism is not entirely accurate, as the statute does not provide for <u>shared</u> regulation of coal mining. Rather, the Act provides for enforcement of either a federal program or a State program, but not both. Thus, in contrast to other "cooperative federalism" statutes, SMCRA exhibits extraordinary deference to the States. <u>See</u> Mark Squillace, <u>Cooperative Federalism Under the Surface Mining Control and Reclamation Act: Is This any Way to Run a Government?</u>, 15 Envtl. L. Rep. 10039 (1985) (calling SMCRA's "broad delegation" to States "unparalleled"); <u>cf</u>. <u>Bell Atl. Md.</u>, 240 F.3d at 300 (describing analogously how the Telecommunications Act of 1996 "partially flooded the existing statutory landscape with specific preempting federal requirements, deliberately leaving numerous islands of State responsibility"). The statutory federalism of SMCRA is quite unlike the cooperative regime under the Clean Water Act, 33 U.S.C. § 1251 <u>et seq</u>., which was construed in <u>Arkansas v. Oklahoma</u>, 503 U.S. 91 (1992). As the Supreme Court noted there, one of the Clean Water Act's regulations "effectively <u>incorporate[d]</u>" State law into the unitary federal enforcement scheme, making State law, in certain circumstances, federal law. <u>Id</u>. at 110 (emphasis added). Under SMCRA, in contrast, Congress designed a scheme of mutually exclusive regulation by either the U.S. Secretary of the Interior or the State regulatory authority, depending on whether the State elects to regulate itself or to submit to federal regulation. Because West Virginia is a primacy state, its regulation of surface coal mining on nonfederal lands within its borders is "exclusive." <u>See</u> 30 U.S.C. § 1253(a); 30 C.F.R. § 948.10. This federal policy of encouraging "exclusive" State regulation was careful and deliberate. The Act's preliminary findings explain that "because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States." 30 U.S.C. § 1201(f). According to the Act, it is the States, not the federal government, that are to "develop[] and implement[] a program to achieve the purposes of this chapter." <u>Id</u>. § 1202(g). To make this point absolutely clear, SMCRA provides explicitly that when States regulate, they do so exclusively, <u>see id</u>.

31

§ 1253(a), and when the Secretary regulates, he does so exclusively, see id. § 1254(a).

Even so, SMCRA does manifest an ongoing federal interest in assuring that minimum national standards for surface coal mining are enforced. But when a State fails to enforce these minimum national standards, it does not automatically forfeit the right of exclusive regulation. SMCRA vindicates its national-standards policy through a limited and ordered federal oversight, grounded in a process that can lead ultimately to the withdrawal of the State's exclusive control. See 30 U.S.C. §§ 1271, 1267; see also In Re Permanent Surface Mining Regulation Litig., 653 F.2d 514, 520 (D.C. Cir. 1981) (en banc) (hereinafter "Regulation Litig.") (describing the oversight process). Until that withdrawal occurs, because an approved State program must include "a State law which provides for the regulation of surface coal mining and reclamation operations in accordance with the requirements of this chapter," 30 U.S.C. § 1253(a)(1) (emphasis added), the minimum national standards are attained by State enforcement of its own law. "[I]t is with an approved state law and with state regulations . . . that mine operators must comply." Regulation Litig., 653 F.2d at 519; see also Background, Surface Coal Mining and Reclamation Operations Final Rule, 53 Fed. Reg. 26,728, 26,728 (July 24, 1988) (quoting Regulation Litig.).

In sum, even though the States ultimately remain subject to SMCRA, the Act grants "exclusive jurisdiction" to a primacy State (one with an approved program), thereby conditionally divesting the federal government of direct regulatory authority. See Regulation Litig., 653 F.2d at 519; see also 30 U.S.C. § 1253(a) (requiring a would-be primacy State to demonstrate that it has "the capability of carrying out the provisions of this chapter"). Therefore, when a State's program has been approved by the Secretary of the Interior, we can look only to State law on matters involving the enforcement of the minimum national standards; whereas, on matters relating to the good standing of a State program, SMCRA remains directly applicable. See Regulation Litig., 653 F.2d at 519 (observing that "judicial appeals of permit decisions are matters of State jurisdiction in which the Secretary plays no role"); see also 30 U.S.C. § 1276(e).

Bragg argues, however, that despite the federal government's conditional grant of "exclusive jurisdiction" to West Virginia, the

32

national minimum standards set out in SMCRA retain operative force against West Virginia. For example, her complaint asserted that the State Director had violated nondiscretionary duties found in 30 U.S.C. § 1260, which sets out requirements for permit approval, and in § 1265, which establishes standards for reclaiming mined property and preserving the environment.

To construe SMCRA in the manner urged by Bragg, however, would circumvent the carefully designed balance that Congress established between the federal government and the States because the effect of a citizen suit to enjoin officials in a primacy State to comport with the <u>federal</u> provisions establishing the core standards for surface coal mining would end the exclusive State regulation and undermine the federalism established by the Act. Thus, rather than advancing the federal interest in preserving this statutory design, Bragg's interpretation would frustrate it.

While it is true that Congress' desire to implement minimum national standards for surface coal mining drives SMCRA, Congress did not pursue, although it could have, the <u>direct</u> regulation of surface coal mining as its preferred course to fulfill this desire. Nor did Congress invite the States to enforce <u>federal</u> law directly. By giving States exclusive regulatory control through enforcement of <u>their own</u> approved laws, Congress intended that the federal law establishing minimum national standards would "drop out" as operative law and that the State laws would become the sole operative law. <u>Cf</u>. <u>Nat'l Wildlife Fed'n v. Lujan</u>, 928 F.2d 453, 464 n.1 (D.C. Cir. 1991) (Wald, J., concurring) (recognizing that the provisions of SMCRA do not "technically apply" in primacy States). Thus, all of the <u>federal</u> provisions establishing the minimum national standards are not directly operative in West Virginia so long as it remains a primacy State. <u>Cf</u>. <u>Haydo v. Amerikohl Mining, Inc.</u>, 830 F.2d 494, 498 (3d Cir. 1987) (noting that "SMCRA <u>itself</u> is not violated by an operator's violation of a permit condition" (emphasis added)). This is not to say, of course, that <u>all</u> of SMCRA's provisions "drop out." The Act's structural provisions creating the facility through which the State can attain and can lose its primacy status remain directly operative. <u>See</u>, <u>e.g.</u>, 30 U.S.C. §§ 1253, 1254, 1267, 1271. But these provisions are not at issue in this case. Bragg's complaint essentially challenges the Director's failure to follow the permitting requirements set forth in 30

33

U.S.C. § 1260 and the environmental protection performance standards set forth in § 1265, and only § 1260 claims remain in Counts 2 and 3.

Because 30 U.S.C. § 1260 establishes minimum standards that have been adopted by West Virginia and approved by the Secretary, see W. Va. Code § 22-3-18,[4] any violation of this standard involves State law, not federal law, even though the relevant language in the State law is identical to that in the federal law. Accordingly, any injunction against State officials to enforce this provision would command them to comport with the State's own law, not federal law, because only the State law is operative and directly regulates the issuance of permits.

In this case, the district court's injunction created two layers of indignity, as it not only directed the Director to make findings as required by the West Virginia Act, see W. Va. Code § 22-3-18, but in so doing, also ordered the Director to make findings required by the state-law buffer zone regulation, see W. Va. Code St. R. tit. 38 § 2-5.2. That federal command to a State official to comply with the State's law was so abhorrent to the values underlying our federal structure as to fall outside the bounds of the Ex parte Young exception. In Pennhurst, the Supreme Court stated:

> [I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on

_____

[4] The Secretary has routinely interpreted 30 U.S.C. § 1260 as a minimum national standard or requirement that must be adopted by the States to achieve primacy status. Thus, the Secretary requires that a State counterpart to § 1260 be included in an approved State law. See, e.g., Approval of Amendment to Utah Regulatory Program, 63 Fed. Reg. 63,608, 63,608-10 (Nov. 16, 1998); Approval of Amendment to W. Va. Regulatory Program, 61 Fed. Reg. 6511, 6515-16 (Feb. 21, 1996); Approval of Amendments to Ill. Regulatory Program, 55 Fed. Reg. 35,301, 35,303 (Aug. 29, 1990); Approval of Permanent Program Amendments from the State of Ala., 51 Fed. Reg. 29,098, 29,099 (Aug. 14, 1986); Conditional Approval of the Permanent Program Submission from the State of Ark., 45 Fed. Reg. 77,003, 77,015 (Nov. 21, 1980). In accordance with the Secretary's position, West Virginia enacted W. Va. Code § 22-3-18 to satisfy the requirements imposed by 30 U.S.C. § 1260.

> how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that <u>Young</u> and <u>Edelman</u> are inapplicable in a suit against state officials on the basis of state law.

465 U.S. at 106. To be certain, the state-law claims at issue in <u>Pennhurst</u> were of a different character from the claims at issue in this case. In <u>Pennhurst</u>, the Supreme Court noted that because the lower court had exercised <u>pendent</u> jurisdiction over the state-law claims, <u>see id</u>. at 104, an <u>Ex parte Young</u> injunction to enforce those claims was not necessary to vindicate the supremacy of federal law, <u>see id</u>. at 106. In this case, the federal interest in adjudicating the dispute is undoubtedly stronger, as the rights at issue were created by the State pursuant to a federal invitation to implement a program that met certain minimum standards set by Congress. Moreover, the federal government, through the Secretary's oversight role, retains an important modicum of control over the enforcement of that State law. <u>See</u> 30 U.S.C. §§ 1271, 1267; <u>Regulation Litig.</u>, 653 F.2d at 520.

Nonetheless, although "the difference between the type of relief barred by the Eleventh Amendment and that permitted under <u>Ex parte Young</u> will not in many instances be that between day and night," <u>Edelman</u>, 415 U.S. at 667, we conclude that the injunctive relief sought against the State Director in this case "falls on the Eleventh Amendment side of the line" by some distance, <u>Coeur d'Alene Tribe</u>, 521 U.S. at 281, and is therefore barred by the Eleventh Amendment. The <u>Pennhurst</u> Court made clear that its decision was driven by the indignity to which a State is subject when a federal court orders that State's officers to conform their conduct with their own laws -- a concern that is also present in this case. <u>See</u> 465 U.S. at 106. In subsequent Eleventh Amendment decisions, the States' dignity interest has played an increasingly critical role. <u>See</u>, <u>e.g.</u>, <u>Alden v. Maine</u>, 527 U.S. 706, 715 (1999) (noting that states "retain the dignity, though not the full authority, of sovereignty"); <u>Coeur d'Alene Tribe</u>, 521 U.S. at 268 (stating that "immunity is designed to protect" the "dignity and respect afforded a State"); <u>see also S.C. State Ports Auth.</u>, slip op. at 11, ___ F.3d at ___ (noting that it was "the spectre of private suits against the states that mattered to the founders"). That dignity interest does not fade into oblivion merely because a State's law is enacted

35

to comport with a federal invitation to regulate within certain parameters and with federal agency approval. Cf. United States Dep't of Energy v. Ohio, 503 U.S. 607, 625 (1992) (noting that state-law penalties approved by the Environmental Protection Agency and supplanting the Clean Water Act did not "arise under federal law" as meant in 28 U.S.C. § 1331). And particularly in the absence of an explicit incorporation of State law into federal law, cf. Arkansas, 503 U.S. at 110-11; Geis v. Bd. of Educ., 774 F.2d 575, 581 (3d Cir. 1985), States retain a unique interest in the enforcement of their own law against their own officers. This is especially true where, as here, Congress has reserved to the States the "exclusive" right to set the rules by which the regulation of surface mining will be governed. The West Virginia statute and implementing regulations are solely the product of its own sovereignty, enacted pursuant to its democratic processes, and, as was the case in Pennhurst, a State's sovereign dignity reserves to its own institutions the task of keeping its officers in line with that law.

Moreover, it is simply not the case that an Ex parte Young injunction is necessary to "vindicate the supreme authority of federal law" in this context. Pennhurst, 465 U.S. at 106. The SMCRA citizen-suit provision is designed not to vindicate individual rights, but rather to supplement the Secretary's enforcement power under 30 U.S.C. § 1271(b) -- a power that is unaffected by the constraints of the Eleventh Amendment. See Seminole Tribe v. Florida, 517 U.S. 44, 71 n.14 (1996) (citing United States v. Texas, 143 U.S. 621, 644-45 (1892)). If West Virginia's program no longer comports with the federal blueprint found in SMCRA, the Secretary may instigate an enforcement proceeding and revoke West Virginia's authority to regulate surface mining. Additionally, as part of its approved State program, West Virginia enacted a citizen suit provision that, parroting the language of its federal counterpart, gives affected individuals the right to sue in State court to compel the Director's compliance with the West Virginia Act. See W. Va. Code § 22-3-25. Because the West Virginia courts are open to such suits, the federal interest in maintaining the State's compliance with its own program may be fulfilled via suit in that forum, in a manner that does not offend the dignity of the State. See Coeur d'Alene Tribe, 521 U.S. at 274 (opinion of Kennedy, J.).

In sum, rather than asking the States to enforce the federal law, Congress through SMCRA invited the States to create their own laws,

36

which would be of "exclusive" force in the regulation of surface mining within their borders. See Hodel, 452 U.S. at 289 (noting that under SMCRA, states "enact and administer their own regulatory programs"). An order from an Article III court instructing an officer of such a State to conform his conduct with a duly enacted State law would create an affront to that State's dignity similar to that created by the orders at issue in Pennhurst. And particularly when that State's law specifically provides for its own enforcement in a State forum, the concerns that gave rise to the exception of Ex parte Young evaporate.

Accordingly, we conclude that Bragg's claims filed against the State Director in federal court are not authorized by the Ex parte Young exception to the Eleventh Amendment.

C

Alternatively, Bragg contends that West Virginia waived its sovereign immunity in federal court when it elected to submit its program to the Secretary for approval and thereby accepted the federal government's invitation to act as the regulator of surface coal mining in the State. She argues that in exchange for giving the State the right to regulate surface coal mining, "Congress required the states to agree to submit to federal jurisdiction under [30 U.S.C.] § 1270(a)(2) to review their non-discretionary actions for conformity with federal law" and therefore that the State "waived its immunity." We cannot agree.

"If Congress is not unmistakably clear and unequivocal in its intent to condition a gift or gratuity on a State's waiver of its sovereign immunity, we cannot presume that a State, by accepting Congress' proffer, knowingly and voluntarily assented to such a condition." Bell Atl. Md., 240 F.3d at 292. Congress provided no "unequivocal" warning that States which submit a program for approval by the Secretary thereby waive their immunity. To the contrary, the citizen-suit provision explicitly authorizes a compliance action "against . . . the appropriate State regulatory authority," but only "to the extent permitted by the eleventh amendment to the Constitution." 30 U.S.C. § 1270(a)(2) (emphasis added). Far from expressing Congress' clear intent that participating States waive Eleventh Amendment immunity, this lan-

37

guage actually preserves a State's sovereign immunity. See Burnette v. Carothers, 192 F.3d 52, 57 (2d Cir. 1999) (concluding that similar language in the Clean Water Act, the Resource Conservation and Recovery Act, and the Comprehensive Environmental Response, Compensation and Liability Act did not evidence Congress' intent to abrogate state immunity). Accordingly, we reject Bragg's argument that West Virginia waived its sovereign immunity in federal court when it accepted Congress' invitation to assume "exclusive jurisdiction" over the regulation of surface mining within its borders.

IV

In their appeal, the intervening coal companies and coal associations (collectively, "coal companies") contend that the district court lacked subject matter jurisdiction to enter the consent decree, dated February 17, 2000, which approved a settlement that disposed of a number of Bragg's claims against the Director. See Bragg, 83 F. Supp. 2d at 722. They base their challenge on two points. First, they argue that the suit at issue did not fall within the class of suits over which 30 U.S.C. § 1270(a)(2) provides jurisdiction. Noting that the statute creates a cause of action for the Director's failure to perform duties "which are not discretionary," the coal companies contend that the permitting decisions at issue in this case arose from purely discretionary duties. They also maintain that because the duties at issue arose from the West Virginia statute and regulation, § 1270(a)(2) is not pertinent because the duties sought to be enforced are not duties "under this chapter." Second, they argue that because Counts 2 and 3 were barred by the Eleventh Amendment, the counts settled by the consent decree were also barred.

Even though Bragg and the Director voluntarily entered into the settlement agreement and submitted it to the district court for approval by a consent decree, the district court's power to enter the decree depended on its having subject matter jurisdiction over the case. See, e.g., Local No. 93, Int'l Assoc. of Firefighters v. City of Cleveland, 478 U.S. 501, 525 (1986). And, of course, a challenge to subject matter jurisdiction is appropriately raised at any point in the proceedings. See, e.g., Clinton v. City of New York, 524 U.S. 417, 428 (1998). Nevertheless, neither of the coal companies' jurisdictional arguments is truly a challenge to subject matter jurisdiction.

38

The coal companies' argument that the duties at issue were neither "nondiscretionary" nor "under this chapter," while possibly correct, nevertheless does not challenge the lower court's jurisdiction, but rather the merits of the settled claims. Jurisdiction is proper unless "the cause of action alleged is so patently without merit as to justify . . . the court's dismissal for want of jurisdiction." Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 70 (1978) (internal quotation marks and citations omitted) (alteration in original); see also Steel Co. v. Citizens for Better Government, 523 U.S. 83, 89 (1998) (same). It is now settled that 30 U.S.C. § 1270 confers on federal district courts subject matter jurisdiction over at least some sorts of claims. See Molinary v. Powell Mtn. Coal Co., 125 F.3d 231, 235-37 (4th Cir. 1997); Regulation Litig., 653 F.2d at 519. And Bragg's complaint, which alleged that the duties at issue in the consent decree were "nondiscretionary" and "under this chapter," invoked the court's jurisdiction under § 1270. It may be the case, as the coal companies claim, that further legal analysis would have revealed that the duties alleged were either "discretionary" or not "under this chapter." But that type of argument would be properly raised not in a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, but rather in a Rule 12(b)(6) motion to dismiss for failure to state a claim. See Fogel v. Chestnutt, 668 F.2d 100, 105-06 (2d Cir. 1981) (Friendly, J.) (discussing the tendency of courts to conflate these two concepts); 13 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3522, at 78-79 (1984) (same); see also Steel Co., 523 U.S. at 89 ("[T]he district court has jurisdiction if the right of the petitioners to recover under the complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another" (internal quotation marks and citation omitted)); cf. City of Yonkers v. United States, 320 U.S. 685, 695 (1944) (Frankfurter, J., dissenting) ("`Jurisdiction' competes with `right' as one of the most deceptive of legal pitfalls"). As long as Bragg's claims were not clearly frivolous from the face of the complaint, jurisdiction was proper, and a challenge to the consent decree may not be made on a jurisdictional basis.[5]

_____

[5] Moreover, even if subject-matter jurisdiction may be questioned under 30 U.S.C. § 1270(a)(2), Bragg has also invoked jurisdiction by asserting claims under the Clean Water Act, 33 U.S.C. §§ 1251 et seq.,

39

The coal companies also contend that because Counts 2 and 3 were barred by the Eleventh Amendment, the district court's exercise of jurisdiction over the consent decree was also inappropriate. But the coal companies may not assert a defense on behalf of the Director that the Director chooses not to assert. Sovereign immunity, unlike the subject matter jurisdiction requirement, may be waived by the State, see Coeur d'Alene Tribe, 521 U.S. at 267, and it may be the case that when the Director entered into the consent decree and invoked the district court's jurisdiction over it, West Virginia waived its immunity with respect to the claims settled in that decree. See Coll. Sav. Bank, 527 U.S. at 675-76 (citing Gunter v. Atl. Coast Line R.R., 200 U.S. 273, 284 (1906)). But, in any event, the Director has not asserted this defense to the consent decree. Because sovereign immunity reflects the federal courts' respect for the States, we need not undermine that respect by forcing a State to assert immunity when it chooses not to do so. Cf. Wisc. Dep't of Corr. v. Schacht, 524 U.S. 381, 389 (1998) (stating that a court "can ignore" the issue of Eleventh Amendment immunity "[u]nless the State raises the matter").

In sum, we reject the coal companies' challenge to the settlement agreed to by the Director and the consent decree entered by the district court approving it.

V

For the reasons given, the consent decree of February 17, 2000, is affirmed, but the judgment of the district court enjoining the State Director is vacated, and the case is remanded to the district court with instructions to dismiss Bragg's unsettled claims asserted in Counts 2

_____

NEPA, 42 U.S.C. § 4321 et seq., the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the All Writs Act, 28 U.S.C. § 1651(a), and invoking 28 U.S.C. §§ 1331, 1361, 2201, and 2202. If her claim under SMCRA were actually one to enforce a State law claim, the district court would arguably still have jurisdiction over that claim under 28 U.S.C. § 1367(a).

and 3 without prejudice to any suit she may wish to pursue in West Virginia State court.

AFFIRMED IN PART, VACATED IN PART,

AND REMANDED WITH INSTRUCTIONS

41