**CITIZENS COAL COUNCIL, Petitioner**

**v.**

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2014.

Decided Oct. 23, 2014.

Publication Ordered Feb. 11, 2015.

Michael D. Fiorentino, Media, and Walton D. Morris, Jr., Charlottesville, VA, for petitioner.

Barbara J. Grabowski, Assistant Counsel, Pittsburgh, for respondent.

Brandon D. Coneby, Pittsburgh, for intervenor Consol Pennsylvania Coal Company, LLC.

BEFORE: RENÉE COHN JUBELIRER, Judge, and P. KEVIN BROBSON, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge COHN JUBELIRER.

Citizens Coal Council (Citizens) petitions for review of the Order of the Environmental Hearing Board (Board) that granted the Stipulation for Settlement and Joint Motions to Withdraw Appeal (Joint Motions) filed by Consol Pennsylvania Coal Company, LLC (Consol)[1] and the Department of Environmental Protection (Department). The Board agreed with Consol and the Department that it did not presently have jurisdiction to consider Consol's appeal from two letters, dated December 27, 2012 (Letters), issued by the Department because the Letters were not final actions or adjudications. In granting the Joint Motions, the Board relied on its decision in *Chesapeake Appalachia, L.L.C. v. Department of Environmental Protection* (*Chesapeake I*), EHB Docket No. 2012–016–L, issued after Consol filed its appeals, in which it held that a Department letter modifying a proposed corrective action plan was not an action or adjudication subject to immediate appeal. *Chesapeake I* was affirmed by this Court in *Chesapeake Appalachia, L.L.C. v. Department of Environmental Protection*, 89 A.3d 724 (Pa.Cmwlth.2014) (*Chesapeake II*). On appeal, Citizens argues that: (1) *Chesapeake I* and *Chesapeake II* are distinguishable from this case because the Letters here immediately altered the status quo of Consol's obligations under two consent agreements it had with the Department and, therefore, were reviewable final actions; and (2) pursuant to federal and state law, the Letters were actions imme-

---

1. Consol has intervened in Citizens's appeal to this Court.

diately reviewable by the Board. For the following reasons, we affirm.

## I. Factual Background

Consol operates an underground coal mine, the Bailey Mine, in Greene County, Pennsylvania. (Board Decision at 1.) On September 19, 2007, Consol and the Department entered into a Global Streams Consent Order and Agreement (Consent Order), requiring Consol to restore "Unnamed Tributary ('UNT') 32596," which the Department asserted was adversely affected by the mining operations at Bailey Mine (UNT 32596 Consent Order). (Stipulation for Settlement and Joint Motion for EHB Docket # 2013–018–R (UNT 32596 Stipulation and Motion) at 1, R.R. at 266a.) The UNT 32596 Consent Order required Consol to undertake restoration activities on UNT 32596 "and to submit a Final Report documenting" those restoration activities. (UNT 32596 Stipulation and Motion at 1, R.R. at 266a.) The UNT 32596 Consent Order authorized the Department to, "in addition to the remedies prescribed herein, pursue any remedy available for a violation of an order of the Department," and "to require additional measures to achieve compliance with applicable law." (UNT 32596 Consent Order ¶¶ 5a, 6, R.R. at 301a.)

On June 11, 2008 Consol and the Department entered into another Consent Order requiring Consol to restore seven streams (Polly Hollow Streams) the Department asserted were also adversely af-

fected by the Bailey Mine (Polly Hollow Consent Order).[2] (Board Decision at 1; Stipulation for Settlement and Joint Motion to Withdraw Appeal for EHB Docket # 2013–011–R (Polly Hollow Stipulation and Motion) at 1, R.R. at 255a.) The terms of the Polly Hollow Consent Order required Consol "to perform certain stream restoration activities and submit Annual Reports" reflecting the status of the restoration to the Department. (Board Decision at 1–2.) The Polly Hollow Consent Order further indicated that the Department could require Consol to engage in "certain compensatory measures if either Consol or the Department determine[d] that Consol [had] exhausted all technically feasible measures to restore the streams and the affected streams [could not] be restored." (Polly Hollow Stipulation and Motion at 2, R.R. at 256a.)

In Paragraphs 17 and 22 of the UNT 32596 Consent Order and Polly Hollow Consent Order, respectively, Consol and the Department agreed that:

> Any decision which the Department makes under the provisions of this Consent Order and Agreement is intended to be neither a final action under 25 Pa.Code § 1021.2,[3] nor an adjudication under 2 Pa.C.S. § 101.[4] Any objection, which Consol may have to the decision, will be preserved until the Department enforces this Consent Order and Agreement.

---

**2.** The Polly Hollow Consent Order refers to Polly Hollow, UNT 32511, UNT 32595, the Crows Nest, and UNT 32534. (Board Decision at 2.)

**3.** The Department's regulation at 25 Pa.Code § 1021.2(a) defines "action" as "[a]n order, decree, decision, determination or ruling by the Department affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of a person, including, but

not limited to, a permit, license, approval or certification."

**4.** Section 101 of the Administrative Agency Law defines an "adjudication" as "[a]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made." 2 Pa.C.S. § 101.

(UNT 32596 Consent Order ¶ 17, R.R. at 304a; Polly Hollow Consent Order ¶ 22, R.R. at 118a.)

Consol filed its 2012 annual report under the Polly Hollow Consent Order and a report under the UNT 32596 Consent Order (Reports) with the Department. On December 27, 2012, the Department sent the Letters to Consol, indicating that it had reviewed these Reports. Based upon that review, the Department concluded the following as to the Polly Hollow streams:

(1) Consol has performed various remediation efforts over the past 48 months on the affected streams. (2) The Department is unaware of any additional efforts that Consol could be required to take to remediate the affected streams. (3) The Department now requires Consol to perform compensatory mitigation or enhancement measures pursuant to Paragraph 7 [of the Polly Hollow Consent Order].

(Letter from the Department to Consol Regarding Polly Hollow (December 27, 2012) (Polly Hollow Letter), R.R. at 5a.) With regard to UNT 32596, the Department concluded that "[w]e feel any additional remediation activities on U[N]T [3]2596 would be futile; therefore, we are requiring Consol to provide appropriate mitigation and/or compensation for the loss of Commonwealth resources." (Letter from the Department to Consol Regarding UNT 32596 (December 27, 2012) (UNT 32596 Letter), R.R. at 15a.)

## II. Proceedings before the Board

Consol appealed the Letters to the Board, arguing it had complied with the terms of the Polly Hollow Consent Order and the UNT 32596 Consent Order and challenged the Department's conclusion that no further restoration work could be accomplished. On July 1, 2013, Citizens, a Pennsylvania non-profit corporation,[5] petitioned to intervene in Consol's appeals. (Board Decision at 2.) Citizens sought to intervene "to ensure that [the] Board affirm[ed] the determinations and conclusions stated in [the Department's] December 27, 2012, [L]etter[s] to Consol." (Citizens's Petition to Intervene (Polly Hollow) ¶ 21, R.R. at 48a; Citizens's Petition to Intervene (UNT 32596) ¶ 28, R.R. at 61a.) Consol objected to Citizens's intervention.[6] The Board granted Citizens's petitions on July 16, 2013.

Thereafter, on August 15, 2013, the Board issued *Chesapeake I*, in which it

---

**5.** Citizens describes itself as "a national alliance of social and environmental justice grassroots groups and individuals working to protect communities affected by the mining, processing, and burning of coal through advocating enforcement and strengthening of environmental laws as they relate to coal." (Citizens's Petition to Intervene (Polly Hollow) ¶ 1, R.R. at 41a; Citizens's Petition to Intervene (UNT 32596) ¶ 1, R.R. at 55a.) Citizens alleged that the Department's Letters directly affected it and its members. (Citizens's Petition to Intervene (Polly Hollow) ¶ 3, R.R. at 42a; Citizens's Petition to Intervene (UNT 32596) ¶ 3, R.R. at 56a.) Citizens indicated, in particular, that several of its members own properties on which the affected streams had flowed and which have been harmed by, *inter alia*, the de-watering of the streams. (Citizens's Petition to Intervene (Polly Hollow) ¶¶ 4–6, 13–16, R.R. at 42a, 46a–47a; Citizens's Petition to Intervene (UNT 32596) ¶¶ 4–6, 12–20, 22–23, R.R. at 56a, 58a–60a.) For these reasons, Citizens contended that it was an interested party in Consol's appeals. (Citizens's Petition to Intervene (Polly Hollow) ¶ 18, R.R. at 47a; Citizens's Petition to Intervene (UNT 32596) ¶ 25, R.R. at 61a.)

**6.** Consol objected particularly to Citizens's intervention in its appeal of the Polly Hollow Letter because the Citizens's member on whose property the affected stream runs refused to allow Consol onto the property to attempt to restore the stream. (Consol's Answer to Citizens's Petition to Intervene (Polly Hollow) at 2, ¶¶ 15–16, R.R. at 187a, 190a.)

addressed the appealability of Department letters issued pursuant to a consent order. Based on language contained in the consent order in that case, the Board concluded that the Department's letters issued pursuant to the consent order in *Chesapeake I* were not final actions or adjudications, were not immediately appealable, and any challenges to those letters were "preserved until such time as the Department enforce[d] the [c]onsent [o]rder." (Board Decision at 4–5.) Thus, the Board in *Chesapeake I* found that it lacked jurisdiction to consider the appeal which it dismissed. (Board Decision at 5.)

On August 27, 2013, the Department and Consol filed the Joint Motions seeking an order permitting Consol to withdraw its appeals without prejudice.[7] (Board Decision at 3.) The Department and Consol contended that, based on the language contained in the UNT 32596 Consent Order, the Polly Hollow Consent Order, and the Board's decision in *Chesapeake I*, the Letters were not final actions subject to immediate appeal. (Board Decision at 3.) Citizens filed a response to the Joint Motions on September 5, 2013, requesting that the Board deny the Joint Motions and adjudicate Consol's appeals. (Board Decision at 3.) Citizens also filed a Motion for Partial Summary Judgment (Summary Judgment Motion) seeking an order recognizing that the Board had jurisdiction over Consol's appeals. Consol replied that it had "filed its appeals at a time when the issue" of the appealability of such Letters was still in question, but that *Chesapeake I*

had resolved that issue and its challenges regarding the Letters were preserved for the future. (Board Decision at 4.)

■ The Board granted the Joint Motions and dismissed the appeals, without prejudice, finding that the Letters were not appealable actions in accordance with *Chesapeake I.* Although *Chesapeake I* involved the Department's oil and gas program, the present matter involves its surface mining program, over which Pennsylvania holds primary jurisdiction for enforcement pursuant to the Surface Mining Conservation and Reclamation Act[8] (PA Mining Act). (Board Decision at 5.) Citizens asserted that the Federal Surface Mining Control and Reclamation Act of 1977[9] (Federal Mining Act) and the PA Mining Act prohibited the Department and Consol from delaying Citizens's right to bring an appeal at this time. However, the Board noted that the provisions cited by Citizens provide that Pennsylvania afford "any person having an interest which is or may be adversely affected by [such] notice or order" the opportunity for administrative review. (Board Decision at 6 (quoting Section 525(a)(1) of the Federal Mining Act, 30 U.S.C. § 1275(a)(1)).) The Board held that the opportunity for administrative review in this matter has not been denied, but "preserved until such time as the Department enforces the Consent Order[s]" against Consol. (Board Decision at 5–6.) Accordingly, the Board dis-

---

7. The Joint Motions were titled "Stipulation for Settlement and Joint Motions to Withdraw Appeal," which Consol asserts are a "procedural mechanism [that] has long been sanctioned by the ... Board as a means to protect the rights of a party in circumstances where an appeal [is] being 'withdrawn.'" (Consol's Br. at 4.)

8. Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. §§ 1396.1–1396.19b. Pennsylvania was granted approval by the Federal Office of Surface Management to hold primary jurisdiction pursuant to 30 C.F.R. § 938.10 (specifically approving the Pennsylvania state program).

9. 30 U.S.C. §§ 1201–1328.

missed the appeals without prejudice.[10] (Board Decision at 7; Board Order.) Citizens now petitions this Court for review.[11]

### III. Citizens's Petition for Review to this Court

   *a. Whether the Board erred in relying on Chesapeake I and Chesapeake II.*

■ The Board relied upon *Chesapeake I* to allow Consol to withdraw its appeals without prejudice. In *Chesapeake I* and *Chesapeake II*, the appellant entered into a consent order with the Department, under which it was required to submit a corrective action plan (CAP) to the Department for review and approval. *Chesapeake II*, 89 A.3d at 725. After reviewing the appellant's CAP, the Department issued three letters modifying the CAP and then approving the CAP as modified. *Id.* The appellant appealed.[12] *Id.* The consent order at issue included language almost identical to Paragraphs 17 and 22 of the UNT 32596 Consent Order and the Polly Hollow Consent Order, respectively. That consent order stated:

> ... any decision which the Department makes under the provisions of this Consent Order and Agreement, is intended to be neither a final action under 25 Pa.Code § 1021.1, nor an adjudication

under 2 Pa.C.S. § 101. Any objection which Chesapeake may have to the decision will be preserved until the Department enforces this Consent Order and Agreement.

*Chesapeake II*, 89 A.3d at 725. Furthermore, the Department's letters required the appellant to take the actions set forth in the approved modified CAP. *Id.* The Board held that, pursuant to the language of the consent order, the letters were not final actions or adjudications that could be appealed. *Id.* at 726. Thus, the Board granted summary judgment to the Department and dismissed the appellant's appeals.

The appellant appealed to this Court,[13] arguing, *inter alia*, that the letter was "an 'action' because it affects [the appellant's] obligations by requiring [the appellant] to take certain actions ... based upon the fact that the [l]etter approves as modified the CAP [the appellant] submitted." *Id.* at 727. This Court disagreed, indicating that the appellant's argument "ignore[d] the broader factual background of the case." *Id.* We explained that the appellant was

> already obligated, by the terms of the [consent order] that it voluntarily executed, to identify, evaluate, and perform remedial work upon all the [a]ffected

---

**10.** Citizens raised several arguments related to alleged procedural deficiencies in the Joint Motions but, because the Board held that it did not have jurisdiction, it did not reach these issues. (Board Decision at 7 n. 4.) The Board did not specifically act on Citizens's Summary Judgment Motion; however, in granting the Joint Motions based on its lack of jurisdiction, it effectively denied the Summary Judgment Motion.

**11.** "This Court's scope of review of a decision by the [Board] is limited to determining whether the [Board] committed an error of law, violated constitutional rights, or whether

substantial evidence supports its findings of fact." *Chesapeake II*, 89 A.3d at 726 n. 2.

**12.** The appellant in *Chesapeake I* and *Chesapeake II* appealed each of the letters to the Board; however, because each letter superseded the prior letter, the Board concluded that the first two letters were moot. *Chesapeake II*, 89 A.3d at 726 n. 1.

**13.** Because the third and final letter superseded and replaced the two previous letters, the appellant only appealed to this Court the Board's determination that the third letter was not an appealable action. *Chesapeake II*, 89 A.3d at 726 n. 1.

wells. This work is, in fact, the entire point of the CAP, which [the appellant] was required to submit and carry out under the terms of the [consent order]. *Id.* (citation omitted). We concluded, therefore, that the letter modifying the CAP did not affect the status quo, but "delineat[ed] [the appellant's] already existing obligations and, thus, [did] not constitute an action." *Id.* (quotation marks omitted). Finally, we observed that it was the CAP, not the letter approving the CAP, that was enforceable under the consent order, but that even the CAP did "not affect [the appellant's] liabilities until the ... Department brings an enforcement action against [the appellant]—that [the appellant] may defend by challenging the conditions imposed by the Department." *Id.* In essence, by holding that the appellant's liabilities were not affected by either the letter or the CAP, we concluded that the appellant was not aggrieved at that time and would not be able to challenge the conditions until the Department brought an enforcement action.

On appeal, Citizens argues that *Chesapeake I* and *Chesapeake II* are distinguishable because, unlike the letters in that case, the Department's Letters were final actions since they immediately altered the status quo between the Department and Consol that was established by the Polly Hollow Consent Order and UNT 32596 Consent Order in a manner that materially affected Citizens and its members. According to Citizens, the Letters announced the Department's decision, determination, or ruling that, *inter alia*, any future efforts by Consol to remediate UNT 32596 would

be futile and, therefore, the Department was " 'requiring Consol to provide appropriate mitigation and/or compensation for the loss of Commonwealth resources.' " (Citizens's Br. at 19 (quoting UNT 32596 Letter, R.R. at 15a).) Citizens asserts that these findings and conclusions affect Consol's property rights and its duties and obligations to engage in costly efforts to remediate UNT 32596 under the UNT 32596 Consent Order and, therefore, constitute appealable actions. Citizens makes similar arguments regarding the Department's statements in the Polly Hollow Letter.

A review of the Letters reveals that they are like those at issue in *Chesapeake I* and *Chesapeake II* and are, therefore, not final actions, at least as to Consol. Here, the Letters reviewed Consol's submissions regarding the status of the remediation of the Polly Hollow Streams and UNT 32596, determined that remediation was no longer feasible or would be futile, informed Consol that it was required, in accordance with the Polly Hollow Consent Order and UNT 32596 Consent Order, to begin making plans to compensate the Commonwealth for the loss of the resources, and directed Consol to contact the Department to discuss those plans. The Polly Hollow Consent Order and UNT 32596 Consent Order obligated Consol to take these actions and authorized the Department to make certain determinations, which, once made, required Consol to move to the next step set forth in the Polly Hollow Consent Order and UNT 32596 Consent Order.[14]

14. The Polly Hollow Consent Order expressly: required Consol to provide the Department with annual reports describing its restoration efforts of the Polly Hollow Streams, (Polly Hollow Consent Order ¶ 5b, R.R. at 112a–13a); permitted the Department to determine that all technological and economically feasi- ble measures had been exhausted and require Consol to "perform compensatory restoration or enhancement measures," (Polly Hollow Consent Order ¶ 6, R.R. at 113a); and required Consol, after the Department makes this determination, to submit a compensatory plan, subject to Department review and ap-

Thus, as in *Chesapeake II*, the Letters did not alter the status quo, but "delineat[ed] [Consol's] already existing obligations." *Chesapeake II*, 89 A.3d at 727. The difference in the correspondence in the present matter and in *Chesapeake I*

and *Chesapeake II* is more temporal than substantive, with the letters in *Chesapeake I* and *Chesapeake II* being issued at the beginning of the corrective action process and the Letters here being issued near the end of the process.[15] According-

proval. (Polly Hollow Consent Order ¶¶ 7a–7c, R.R. at 114a). The Polly Hollow Letter indicates that, after reviewing Consol's annual report of the status of the restoration of the Polly Hollow Streams, the Department was unaware of any other methods it could require Consol to take to remediate the streams. (Polly Hollow Letter at 1, R.R. at 5a.) Therefore, the Department was going to "require[ ] Consol to perform [the] compensatory mitigation or enhancement measures pursuant to Paragraph 7" and directed Consol to contact the Department to discuss those plans. (Polly Hollow Letter at 1–2, R.R. at 5a–6a.) Thus, the Polly Hollow Letter did not, as Citizens asserts, change or impose additional obligations on Consol under the Polly Hollow Consent Order because Consol was always obligated to engage in the compensatory mitigation activities if the restoration of the Polly Hollow Streams was unsuccessful. (Polly Hollow Consent Order ¶¶ 6–7, R.R. at 113a–14a.)

The UNT 32596 Consent Order: required Consol to complete certain restoration activities as set forth in an approved restoration plan and required Consol to file a report indicating what restoration activities had been completed on UNT 32596, (UNT 32596 Consent Order ¶¶ 3a–3b, R.R. at 300a); provided that Consol's obligations regarding UNT 32596 did not terminate until it had been restored to its pre-mining conditions, (UNT 32596 Consent Order ¶ 3c, R.R. at 300a); but authorized the Department to, "in addition to the remedies prescribed herein, pursue any remedy available for a violation of an order of the Department," and "to require additional measures to achieve compliance with applicable law," (UNT 32596 Consent Order ¶¶ 5, 6, R.R. at 301a). Like the Polly Hollow Letter, the UNT 32596 Letter indicated that the Department had reviewed Consol's report and concluded that, despite completing all the remediation efforts required by the UNT 32596 Consent Order, additional attempts at restoration were futile. (UNT 32596 Letter, R.R. at 15a.) Based on this conclusion, the Department was "requiring Consol to provide appropriate mitigation

and/or compensation for the loss of Commonwealth resources" and requested Consol to contact the Department to discuss plans on how to accomplish this next step. (UNT 32596 Letter, R.R. at 15a.) The UNT 32596 Consent Order authorized the Department to seek additional remedies, and the UNT 32596 Letter reflected the Department's decision to take that next step. Although Citizens argues in its reply brief that the UNT 32596 Consent Order contains no specific provision regarding the "next step" Consol should take if its remediation efforts became futile, Citizens's reading of the UNT 32596 Consent Order is very narrow, particularly where the negotiated UNT 32596 Consent Order authorizes the Department to require Consol to take additional measures and pursue other remedies to resolve any violation of the PA Mining Act. (UNT 32596 Consent Order ¶¶ 5, 6, R.R. at 301a.)

15. Other precedent supports the conclusion that the Letters were not final actions, but were simply the next step in a multi-step regulatory process that did not immediately affect Consol's rights and obligations. This Court has held that Department correspondence may not be a final action, but may be an interim decision not subject to appeal. *See, e.g., Environmental Neighbors United Front v. Department of Environmental Resources*, 159 Pa.Cmwlth. 326, 632 A.2d 1097, 1099–1100 (1993) (holding a letter that found that an applicant's proposed facilities were not prohibited under the first phase of a two-phase process was not a final action, but was "one step in a continuing multi-step process" and that appeal rights attached to the final decision to approve or disapprove the permit); *Fiore v. Department of Environmental Resources*, 98 Pa.Cmwlth. 35, 510 A.2d 880, 882–83 (1986) (holding that a notice of violation, which indicates that it is not a final action, is not an appealable action or adjudication, noting that the notice could be challenged if the Department subsequently denied a permit based on the violation contained in the notice); *Department of Environmental Re-*

ly, the Board did not err in relying on *Chesapeake I* to conclude that the Letters, and the determinations therein, were interim decisions that are not appealable by Consol at this time.

Citizens also argues that the Board erred in relying on *Chesapeake I* to dismiss Consol's appeals because, to the extent Consol agreed to waive certain of its appeal rights related to preliminary Departmental actions, Citizens was not a party to the Consent Orders and it did not agree to waive any of its or its members rights to an adjudication of the enforcement action that it intervened in to defend. Citizens acknowledges that the Polly Hollow Consent Order and UNT 32596 Consent Order contain the same language regarding the delayed right to appeal the Department's interim decisions that was at issue in *Chesapeake I* and *Chesapeake II*, but asserts that its members' rights were not affected by that language.

■ Citizens's status as intervenor does create · some procedural differences between the present matter and *Chesapeake I*, and *Chesapeake II*, in which the regulated entity sought to continue its own appeal in opposition to the Department's contention that the Board lacked jurisdiction. Citizens intervened in this matter to defend the Letters and protect its members' rights. Citizens admits that it "and its members are not adversely affected by the Letters [or the Consent Orders], and they do not challenge them in any respect. Indeed, [Citizens] intervened below to secure an order **affirming** the futility determinations that the Letters announce." (Citizens's Reply Br. at 10–11 (emphasis in original).) Because it is an intervenor, Citizens cannot rely on *its* rights to assert

---

sources v. New Enterprise Stone & Lime Co., 25 Pa.Cmwlth. 389, 359 A.2d 845, 847 (1976) (concluding that a letter that denied a request to modify a consent agreement was not an appealable final action because that decision did "not result in any action being taken against a party and ... does not, therefore, affect property rights, privileges, liabilities and other obligations"). This Court has recognized an important public policy that "is ... served by avoiding piecemeal appeals which often create unnecessary delay and legal cost ... [and] can create confusion as to when individual issues are appealable." *Environmental Neighbors*, 632 A.2d at 1100; *see also HJH, LLC v. Department of Environmental Protection*, 949 A.2d 350, 353 (Pa.Cmwlth. 2008) (explaining that allowing appeals from each step of a permitting process or interim decision making "would open the door to a proliferation of appeals challenging only one step of the Department's ... process before final action" that "would bring inevitable delay to the system and involve the Board in piecemeal adjudication of complex, integrated issues").

Neither the Polly Hollow Letter nor the UNT 32596 Letter "result in any action being taken against [Consol] and ... does not,

therefore, affect property rights, privileges, liabilities and other obligations." *New Enterprise*, 359 A.2d at 847. Rather, they were "one step in a continuing multi-step process," *Environmental Neighbors*, 632 A.2d at 1099, of attempting to restore the Polly Hollow and UNT 32596 streams or compensating the Commonwealth for the loss of those streams. Indeed, both Letters required Consol to contact the Department to discuss the next step. (Polly Hollow Letter at 2, R.R. at 6a; UNT 32596 Letter, R.R. at 15a.)

Citizens argues, in its reply brief, that these cases, among others, are distinguishable because the Letters were final actions, not interim decisions, in that they permanently affected/terminated Consol's reclamation liabilities and obligations. Citizens further asserts that the "next step" provisions of the Polly Hollow Consent Order and UNT 32596 Consent Order are predicated on the Department's *final* determination that restoration was no longer feasible or was futile. Therefore, according to Citizens, the Letters directing Consol to start the "next step" of the remediation process necessarily had to be final determinations over which the Board has jurisdiction. However, the reasons asserted in Citizens's reply brief do not alter our conclusion that the Letters were not final actions.

jurisdiction where there is no allegation that it or its members are in any way adversely affected by the Department's actions. As Consol and the Department point out, Citizens, as an intervenor, takes the case as it stands. *Pennsylvania Coal Mining Association v. Department of Environmental Resources,* 498 Pa. 1, 444 A.2d 637, 638 (1982). "[A]n intervenor must raise claims in subordination to and in recognition of the propriety of the original action. . . ." *Appeal of Municipality of Penn Hills,* 519 Pa. 164, 546 A.2d 50, 52 (1988) (citing *Bannard v. New York State Natural Gas Corporation,* 404 Pa. 269, 172 A.2d 306, 312 (1961)); *see also Sell v. Douglas Township Zoning Hearing Board,* 149 Pa.Cmwlth. 425, 613 A.2d 162, 164 n. 6 (1992) (stating that "an intervenor cannot maintain claims or defenses which [are] not in subordination to and in recognition of the propriety of" the original action).

Citizens's claims in the present matter, where it acknowledges that it and its members were not adversely affected by the Letters or the Consent Orders, are related solely to *supporting* the Department's actions and defending those actions against a challenge by Consol. Citizens's interests in supporting the Letters are preserved until such time as the Department takes action to enforce the Letters and/or the Consent Orders. Accordingly, in this situation, the Board did not err in finding that the Letters were not final actions subject to immediate appellate review and granting the Joint Motions based on its lack of jurisdiction.

*b. Whether Federal and State Law required the Board to immediately review the Letters as final actions.*

■ Citizens argues, in the alternative, that the Federal Mining Act and the PA

Mining Act require that the Letters be immediately reviewable. Citizens asserts that Section 525(a)(1) of the Federal Mining Act, 30 U.S.C. § 1275(a)(1), requires "the Board to review any decision, determination, or ruling by [the Department] that constitutes a modification of any remedial obligation specified in any enforcement order *or any consent order and agreement*" and invalidates the language of the Polly Hollow Consent Order and UNT 32596 Consent Order that attempts to defer administrative review. (Citizens's Br. at 31 (quotations omitted) (emphasis added).) Citizens argues that the PA Mining Act, and the federally-approved Pennsylvania enforcement program (Pennsylvania Program), have incorporated this mandate into state law because nothing in the PA Mining Act or Pennsylvania Program "shall . . . be construed to violate any of the requirements of . . . the [Federal Mining Act]." Section 18.10 of the PA Mining Act, 52 P.S. § 1396.18j.[16] Additionally, citing *Department of Environmental Resources v. Bethlehem Steel Corporation,* 469 Pa. 578, 367 A.2d 222, 227 (1976), Citizens asserts that Pennsylvania courts have recognized a duty to examine federal law and policy when construing Pennsylvania's programs implementing federal environmental statutes.

Citizens primarily relies on Section 525(a)(1) of the Federal Mining Act to support its claim that the Board should have denied the Joint Motions and immediately reviewed the Letters. That provision states, in its entirety:

(a) Application for review of order or notice; investigation; hearing; notice

(1) A permittee issued a notice or order by the Secretary [of the Office of Surface Management (Secretary) ] pursuant to the provisions of paragraphs (2)

---

**16.** Added by Section 11 of the Act of December 18, 1992, P.L. 1384.

and (3) of subsection (a) of section [521] of this title,[17] or pursuant to a Federal program or the Federal lands program, or any person having an interest which is or may be adversely affected by such notice or order or by any modification, vacation, or termination of such notice or order, may apply to the Secretary for review of the notice or order within thirty days of receipt thereof or within thirty days of its modification, vacation, or termination. Upon receipt of such application, the Secretary shall cause such investigation to be made as he deems appropriate. Such investigation shall provide an opportunity for a public hearing, at the request of the applicant or the person having an interest which is or may be adversely affected, to enable the applicant or such person to present information relating to the issuance and continuance of such notice or order or the modification, vacation, or termination thereof. The filing of an application for review under this subsection shall not operate as a stay of any order or notice.

30 U.S.C. § 1275(a)(1) (emphasis added).

There are three reasons why Citizens's arguments are not persuasive. First, it is questionable whether Section 525(a)(1) provides the relief Citizens asserts it offers because that section governs administrative review of very particular types of orders issued, modified, vacated, or terminated under the Federal Mining Act. None of the orders or notices referred to in Section 525(a)(1) are related to consent orders and agreements or the alleged modifications thereof, which is what Citizens alleges occurred here. Second, as the Board stated in its Decision, to the extent that Section 525(a)(1) could require that Pennsylvania law "afford 'any person having an interest which is or may be adversely affected by such notice or order' the opportunity for administrative review," this "right is guaranteed by virtue of an appeal to the ... Board" and that "[h]ere, the opportunity to appeal has not been denied, but simply preserved to such time as the Department enforces the provisions of the" Polly Hollow Consent Order and UNT 32596 Consent Order. (Board Decision at 6 (quoting 30 U.S.C. § 1275(a)(1)).) Moreover, Section 525(a)(1) speaks to those whose rights have been adversely affected and, here, Citizens acknowledges that neither it nor its members were adversely affected by the Letters or Consent Orders and that it intervened to support the Letters. (Citizens's Reply Br. at 10–11.) Finally, as the Department notes, Section 503(a) of the Federal Mining Act, 30 U.S.C. § 1253(a), provides that, under the Federal Mining Act, states with approved state programs assume *exclusive*

---

17. Section 521(a)(2) of the Federal Mining Act requires the Secretary, after an inspection and determination that a permittee is violating the Federal Mining Act or a permit granted under the Federal Mining Act in a manner that "creates an imminent danger to the health or safety of the public, or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources" to order the cessation of mining activities relevant to the violation and the order remains in effect until a determination that the violation is abated. 30 U.S.C. § 1271(a)(2). Section 521(a)(3) provides that where an investigation occurring "during the enforcement of a Federal program ... or during Federal enforcement of a State program" shows that the permittee is violating the Federal Mining Act or a permit granted under the Federal Mining Act but the violation does not create, *inter alia*, imminent danger, the Secretary must issue the permittee a notice setting a reasonable time, not exceeding ninety days, to abate the violation and provide for a public hearing. 30 U.S.C. § 1271(a)(3). If the violation is not abated in the time set by the notice, the Secretary shall immediately order the cessation of mining operations relevant to the violation, which will remain in effect until the violation is "abated or until modified, vacated, or terminated by the Secretary...." *Id.*

*jurisdiction* over the regulation of surface coal mining and reclamation operations on nonfederal lands within the state's borders. (Department's Br. at 23–24.)

■ The Third Circuit Court of Appeals has explained that the Federal Mining Act's "purpose was to 'assist' the states in developing a satisfactory program and regulations" and "once that program was developed ... and ... approved ... the state would be granted 'primary governmental responsibility' for regulating surface coal mining and reclamation operations." *Pennsylvania Federation of Sportsmen's Clubs v. Hess*, 297 F.3d 310, 316 (3d Cir.2002) (citations omitted). Under the concept of "primacy," once the state program has been approved, courts " 'can look only to State law on matters involving the enforcement of the minimum national standards.' " *Id.* (quoting *Bragg v. West Virginia Coal Association*, 248 F.3d 275, 295 (4th Cir.2001)). The Third Circuit Court further recognized that the state laws could be different from the Federal Mining Act, so long as the minimum federal standards were met. *Id.* (stating "there

would be no reason to allow the states to impose their own regulations if the regulations had to be the same as the [F]ederal [Mining] Act and regulations" (quotation omitted)).

With these principles in mind, we conclude that the Federal Mining Act does not confer jurisdiction on the Board to review the Letters. Moreover, to the extent that the PA Mining Act must be construed in a manner consistent with the Federal Mining Act, appellate review of the intermediate decisions contained with the Letters is not foreclosed, but simply delayed until an enforcement action is filed against Consol.[18] At that time, Citizens will have the opportunity to support the Department's actions as it sought to do in the present matter.

## IV. CONCLUSION

For the foregoing reasons, the Board's Order is affirmed.

### ORDER

**NOW**, October 23, 2014, the Order of the Environmental Hearing Board, en-

---

**18.** *Bethlehem Steel* does not require a different result. In *Bethlehem Steel*, Bethlehem Steel and the Department entered into a consent order requiring that Bethlehem Steel cease certain operations at and make certain alterations to several of its plants before a particular date to abate air pollution. *Bethlehem Steel*, 367 A.2d at 225. Bethlehem Steel requested modification of the consent order to give it additional time to operate its plants, which the Department denied, and Bethlehem Steel appealed to the Board. *Id.* While that appeal was pending, the Department sought an enforcement order in this Court based on Bethlehem Steel's continued operation of its plants in violation of the consent order. *Id.* Bethlehem Steel filed preliminary objections challenging this Court's jurisdiction to rule on the enforcement action, which we overruled. *Id.* at 225. Bethlehem Steel appealed, and the Supreme Court affirmed. *Id.* at 224. Our Supreme Court held that the consent order, which was entered into voluntarily,

was an unappealed order of the Department with which Bethlehem Steel had to comply despite its ongoing appeal of the Department's decision to deny modification of the consent order. *Id.* at 226. After reviewing the policies set forth in the federal and state acts to protect public health, the Supreme Court concluded that the Department could seek an enforcement order and that to deprive this Court of jurisdiction to issue such order would be inconsistent with the statutory policies. *Id.* at 226–29. The Supreme Court, in *Bethlehem Steel*, merely confirmed the principle that where a state carries out a federal program, it must do so in a manner consistent with the policies of that program. Here, in approving the Pennsylvania Program, including its statutes and regulations, the Federal authorities have determined that it is consistent with the Federal Mining Act and, therefore, it is Pennsylvania's statutes and regulations that must be applied in the present matter.

tered in the above-captioned matter, is hereby **AFFIRMED.**