IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Summit Academy,                          :
                         Petitioner          :
                                             :   No.  257 C.D. 2015
                         v.                  :
                                             :   Submitted:  September 4, 2015
Department of Human Services,                :
                         Respondent          :


BEFORE:    HONORABLE BERNARD L. McGINLEY, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE JAMES GARDNER COLINS, Senior Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                          FILED:  December 7, 2015


         The Summit Academy (Facility), a private residential treatment center for dependent and delinquent youth, petitions for review of the February 2, 2015 final order of the Department of Human Services (Department), Bureau of Hearings and Appeals (Bureau), adopting the recommendation of an Administrative Law Judge (ALJ) that the Facility's appeal from a license inspection summary (LIS) should be dismissed for lack of jurisdiction.  On appeal, the Facility contends that the Department's regulations and procedures governing the LIS violate due process.


**Background**

         The facts and procedural history of this case are as follows.  On October 17, 2014, a representative of the Department conducted an on-site inspection of the Facility.  At the conclusion of the inspection, the representative completed an LIS

listing two violations. The first violation concerned diagnosed injuries that a resident sustained while being manually restrained by Facility employees. The second violation involved the Facility's inaccurate records as to the time-frame in which the resident was restrained. (Reproduced Record (R.R.) at 3a-6a.)

More specifically, the LIS named the applicable regulations and described the violations as follows:

**1. Regulation 55 Pa. Code §3800**

3800.32(b) – A child may not be abused, mistreated, threatened, harassed or subject to corporal punishment.

**2a. Description of Violation**

Staff Member A manually restrained resident #1 on 10/8/14 around 8:30 p.m. on the facility's third floor catwalk resulting in the resident's diagnoses of a closed rib fracture, a left wrist injury, and a facial contusion.

\* \* \*

**1. Regulation 55 Pa. Code §3800**

3800.213 – A record of each use of a restrictive procedure, including the emergency use of a restrictive procedure, shall be kept and shall include the following:

(2) The date and time the procedure was used . . .

(6) The duration of the procedure . . .

**2a. Description of Violation**

Resident #1 was manually restrained on 10/8/14 in the cafeteria and minutes later was manually restrained on the third floor catwalk. The restrictive procedure record for the manual restraint in the cafeteria indicated that the restraint began at 8:35 p.m. and ended at 8:40 p.m. and the restrictive procedure record for the manual restraint on the

2

third floor catwalk indicated that the restraint began at 8:30 p.m. and ended at 8:35 p.m. The restrictive procedure records do not accurately indicate the time of the manual restraints.

(R.R. at 4a-5a.)

On November 26, 2014, the Department sent the Facility a letter with the LIS enclosed. In pertinent part, the letter stated:

> The Department requires that you submit an acceptable plan to correct noncompliant items pursuant to 55 Pa. Code §20.52 (relating to plan of correction). You should begin to implement your plan immediately upon submission. The Department will notify you if the plan you submit is not acceptable and must be changed.
>
> In order to submit an acceptable plan of correction, you must complete Section 3 of the attached [LIS], by stating the actions you will take to correct each of the violations. Your plan of correction must immediately correct the specific issue cited, as well as include an ongoing, step-by-step plan to assure continued compliance with the regulation over a substantial period of time. Your plan of correction for each violation should include: what specific change will be made, who will make the change, when will the change be made, how will the change be made, what system have you implemented to make sure that the same violation will not occur again and what training will be provided to your staff. Send any supporting documentation to verify compliance of any corrected violation. **If you believe any violation is incorrect, you may say that in your comments under Section 3 but you still must include a plan to reach and maintain compliance. Sign and date the bottom of each page of the [LIS]**.
>
> Return the attached [LIS] within 10 calendar days of the mailing date of this letter. Your license to operate the above facility may be revoked if the [LIS] is not received within the required time period. . . .

> I am available to explain any statements on the attached form and to assist you in the development of an acceptable plan of correction. Thank you for your cooperation.

(R.R. at 1a-2a) (emphasis supplied).

On December 4, 2014, the Facility filed an appeal from the November 26, 2014 letter, asserting that the violations listed in the LIS were "unsubstantiated" and could be used "in future enforcement actions." (R.R. at 11a.) Specifically, the Facility contended that the Department's representative relied upon erroneous information, and it asserted that a proper investigation would have revealed that the resident hurt himself when he slipped and fell on a wet floor and that the length of time the resident was restrained was recorded accurately. To support its contentions, the Facility attached the affidavits of two of its employees. (R.R. at 9a-23a.) The Facility further asserted that the Department's failure to provide it "an avenue to appeal these improper and unsubstantiated violations constitutes a violation of [the Facility's] due process rights." (R.R. at 11a.)

On December 12, 2014, the Department acknowledged the Facility's request for appeal and forwarded it to the Bureau. The ALJ issued a rule to show cause as to why the appeal should not be dismissed for want of jurisdiction, and both the Facility and the Department filed responses. (R.R. at 24a-25a.)

In its response, the Facility contended that the November 26, 2014 letter was an adjudication because the LIS could be used to take adverse action against the Facility's certificate of compliance; the Facility would have no recourse to challenge the findings and violations in the LIS; and the failure to permit an appeal and hearing violates the Facility's right to procedural due process. In its response, the Department argued that the LIS did not impose any sanction against the Facility or immediately jeopardize its certificate of compliance; the Facility would have the right to appeal in the event the Department would take action in the future based upon the

4

LIS; and case law establishes that notice of a regulatory violation (absent a sanction) does not constitute an adjudication. (R.R. at 26a-35a.)

Upon consideration of the parties' submissions, the ALJ recommended that the Facility's appeal be dismissed for failing to state a claim for which the Bureau can grant relief. (R.R. at 37a.) On February 2, 2015, the Bureau issued an adjudication and order upholding the ALJ. In doing so, the Bureau made the following findings of fact:

1. [The Facility] is a residential juvenile facility.

2. On November 26, 2014, the Department mailed a letter to [the Facility] which included a [LIS] that cited violations of regulations relating to child residential and day treatment facilities.

3. The November 26, 2014 letter required [the Facility] to submit a plan of correction to address the cited violations within ten (10) calendar days of the mailing date of the letter.

4. The November 26, 2014 letter stated that failure to submit a timely plan of correction may result in the revocation of [the Facility's] license to operate.

5. The November 26, 2014 letter stated, "If you believe any violation is incorrect, you may say that in your comments under Section 3 but you must still include a plan to reach and maintain compliance."

6. The November 26, 2014 letter did not propose to deny, not renew, or revoke [the Facility's] certificate of compliance. It did not issue a provisional license, reduce the maximum capacity of the facility or deny a request to increase the maximum capacity of the facility.

7. On December 12, 2014, the Bureau received a request for hearing from [the Facility] to dispute the [LIS]

5

findings because these findings may be used by the Department in future enforcement actions.

8.      On December 19, 2014, the Bureau issued an order to show cause why [the Facility's] appeal should not be dismissed as it appears the Bureau does not have jurisdiction.

9.      On January 16, 2015, [the Facility] responded to the Bureau's order but the response failed to set forth a cause of action for which the Bureau can grant relief.

(Findings of Fact (F.F.) at Nos. 1-9.)

From these facts, the Bureau determined that it lacked jurisdiction to entertain the Facility's appeal pursuant to the regulation at 55 Pa. Code §20.81, which grants the right to appeal only when the Department denies, revokes, or decides not to renew a certificate of compliance and for other reasons that are not pertinent to this appeal.[1]   The Bureau stated that the November 26, 2014 letter did not revoke the

---

[1] The regulation provides:

**§ 20.81. Decisions that may be appealed.**

The legal entity has the right to appeal any of the following:

(1)  The denial of a certificate of compliance.

(2)  The nonrenewal of a certificate of compliance.

(3)  The revocation of a certificate of compliance.

(4)  The issuance of a provisional certificate of compliance.

(5)  The length of time for which a provisional certificate of compliance is issued.

(6)  The reduction in the maximum capacity of the facility or agency.

**(Footnote continued on next page…)**

Facility's certificate of compliance and noted that it advised the Facility of its right to explain why it believes the violations are incorrect. Ultimately, the Board concluded that it did not possess jurisdiction to overturn findings in a LIS, but suggested that the Facility would be able to challenge the findings if the Department would decide, in the future, to take adverse action against the Facility's certificate of compliance. (Bureau's decision at 2-3.)

## Discussion

On appeal to this Court,[2] the Facility argues that the violations listed in the LIS are baseless and that it should not have to submit a plan of correction. The Facility concedes that 55 Pa. Code §20.81 does not grant it the right to appeal, but argues that the regulation, as applied, violates its due process rights because the Facility is not afforded an appeal and hearing to contest the violations in the LIS. For support, the Facility cites *Department of Transportation, Bureau of Driver Licensing v. Clayton*, 684 A.2d 1060 (Pa. 1996), and claims that the effect of an LIS is to create an impermissible, irrebutable presumption that it committed the

---

**(continued…)**

> (7) The denial of an increase in the maximum capacity of the facility or agency.

55 Pa. Code §20.81.

[2] Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, and whether necessary findings of fact are supported by substantial evidence. *Nancy Hadlock's Family Child Care Home v. Department of Public Welfare*, 103 A.3d 851, 857 n.12 (Pa. Cmwlth. 2014).

violations.[3]  Noting that the LIS is made available to the public on the Department's website,[4] the Facility also argues that a Pennsylvania citizen has a fundamental right to protect the individual's reputation and that this right cannot be deprived without due process of law.  In this regard, the Facility relies primarily on our decision in *Pennsylvania Bar Association v. Commonwealth*, 607 A.2d 850 (Pa. Cmwlth. 1992).

## The Regulations

The regulations at 55 Pa. Code §§3800.1—.312 govern child residential facilities in this Commonwealth, such as the Facility.  The purpose of the regulations "is to protect the health, safety and well-being of children receiving care in a child residential facility through the formulation, application and enforcement of minimum licensing requirements."  55 Pa. Code §§3800.1.  In general, the regulations cover a multitude of subjects; for instance, child rights, staff training, the safety of the facility, child and staff health, transportation, medication, restrictive procedures, and secure detention.  *See generally* 55 Pa. Code §§3800.1—.312.  As a licensing matter, a child residential facility must obtain and maintain a certificate of compliance from the Department.  *See* 55 Pa. Code §3800.11.

The Department's regulations define a "certificate of compliance" as a "document issued to a legal entity permitting it to operate a specific type of facility or

---

[3] In *Clayton*, a regulation provided for the revocation of an individual's driving privileges for one year upon the occurrence of an epileptic seizure.  Our Supreme Court declared that the regulation was unconstitutional as violating due process.  Significantly, the aggrieved individual had no method of rebutting the regulation's presumption that the seizure rendered him unfit to drive.

[4] *See* http://services.dpw.state.pa.us/dhs/ViolationReport.aspx?reportid=47204&fac=THE SUMMIT ACADEMY

agency, at a given location, for a specified period of time, and according to appropriate Departmental program licensure or approval regulations." 55 Pa. Code §20.4. To ensure compliance with the regulations, an authorized agent of the Department can conduct a pre-announced annual inspection and unannounced on-site inspections, and can investigate complaints made against a facility. 55 Pa. Code §§20.31—.33. If the agent observes items of noncompliance, an LIS will be issued to the facility, and, in response, the facility "shall submit an acceptable written plan to correct each noncompliance item and shall establish an acceptable period of time to correct these items." 55 Pa. Code §20.52. The Department may deny, refuse to renew, or revoke a certificate of compliance when a facility fails "to submit an acceptable plan to correct noncompliance items." 55 Pa. Code §20.71(3). If the Department decides to revoke or not renew a certificate of compliance, a facility has the right to an appeal and evidentiary hearing before an ALJ and the Bureau. 55 Pa. Code §§20.81(2)-(3); 20.82; 3800.12. *See City of Philadelphia, Board of License and Inspection Review v. 2600 Lewis, Inc.*, 661 A.2d 20, 22 (Pa. Cmwlth. 1995).

### Due Process

The Fourteenth Amendment to the United States Constitution provides, in relevant part, that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1. To maintain a due process challenge, a party must initially establish the deprivation of a protected property or liberty interest. *Miller v. Workers' Compensation Appeal Board (Pavex, Inc.)*, 918 A.2d 809, 812 (Pa. Cmwlth. 2007).

9

Our Supreme Court "has recognized that the right to reputation, although absent from the federal constitution, is a fundamental right under the Pennsylvania Constitution." *In the Interest of J.B.*, 107 A.3d 1, 16 (Pa. 2014).

> [I]n Pennsylvania, reputation is an interest that is recognized and protected by our highest state law: our Constitution. Sections 1 and 11 of Article I[5] make explicit reference to 'reputation,' providing the basis for this Court to regard it as a fundamental interest which cannot be abridged without compliance with constitutional standards of due process. . . .

*R. v. Department of Public Welfare*, 636 A.2d 142, 149 (Pa. 1994).

In *Pennsylvania Bar Association*, this Court invalidated, on procedural due process grounds, section 1822(b)(5) of the Vehicle Code, 75 Pa.C.S. §1822(b)(5), which required insurers to report suspected fraudulent claims to a statutorily created Motor Vehicle Fraud Index Bureau, along with "[i]dentification of attorneys representing claimants" in such claims. 607 A.2d at 852. In that case, the Pennsylvania Bar Association commenced suit in our original jurisdiction, asserting, among other things, that maintaining a list of the attorneys' names would operate to damage their reputations in violation of their constitutional right to protect their reputations.

Citing *Wolfe v. Beal*, 384 A.2d 1187, 1189 (Pa. 1978), this Court in *Pennsylvania Bar Association* noted that our Supreme Court had already recognized

---

[5] Pa. Const. art. I, §1 ("All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."); Pa. Const. art. I, §11 ("All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.").

that the existence of government records, specifically records of an individual's illegal commitment to a state mental hospital, posed a "threat" to that individual's reputation. 607 A.2d at 853-54. We then agreed with the Pennsylvania Bar Association "that the maintenance of a list which includes the names of attorneys representing insurance claimants suspected of fraud . . . poses a serious threat to the reputations of [the attorneys], as discussed in *Wolfe*." 607 A.2d at 856. After determining that the attorneys were entitled to protection under the due process clause, we concluded that the statute's failure to provide notice to the attorneys that they were being placed on the list rendered the statute unconstitutional:

> Yet, disturbingly, the reporting requirements in 75 Pa.C.S. §1822(b) pertaining to the anti-fraud reports provide for no notification to the attorneys when their names are listed in the Index Bureau's record banks.

> The Supreme Court of the United States has recognized that notice is the most basic requirement of due process. Notice is necessary both to inform the interested parties of the pending action and to provide an opportunity to present objections. . . . An attorney may appear on the list, and be subject to negative stigmatization, because the insurer has a suspicion about the client due to previous actions unknown to the attorney. By the time the listing is brought to the attorney's attention, the damage to the attorney's reputation may have been done, and he or she may have lost the opportunity to be heard at a meaningful time and in a meaningful manner . . . .

> We find Section 1822 to be unconstitutional inasmuch as it requires the maintenance of records containing the names of attorneys who represent insurance claimants suspected of fraud because such a scheme ignores the basic due process requirement of notice, and permits the compilation of secret records that tend to unfairly stigmatize an attorney who is reported to the Index Bureau without any opportunity for the attorney to raise an objection to such listing, or even become informed that such a listing will occur.

11

607 A.2d at 856-57 (citations omitted).

Per *Pennsylvania Bar Association*, if an individual's liberty interest in reputation is sufficiently "threatened," the individual possessing the interest is entitled to some method of due process. *See id.* More specifically, procedural due process calls for protections tailored to the demands of the particular situation, making it necessary to balance competing interests. *R.*, 636 A.2d at 146. The three-part inquiry set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), provides guidance in this regard. The *Mathews* analysis requires a court to consider the private interest affected by the official action; the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards; and the Government's interest, including the administrative burden that additional procedural requirements would impose. *R.*, 636 A.2d at 146.

The United States Supreme Court has stated: "when prompt postdeprivation review is available for correction of administrative error, we have generally required no more than that the predeprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official warrants them to be." *Mackey v. Montrym*, 443 U.S. 1, 13 (1979). The High Court has also "recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). *See Zinermon v. Burch*, 494 U.S. 113, 132 (1990) (stating that "in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake . . . post-deprivation remedies might satisfy due process."). The United States Court of Appeals for the Third Circuit has further explained that "the availability and

12

validity of any pre-deprivation process must be analyzed with reference to the context of the alleged violation and the adequacy of available post-deprivation procedures." *Reilly v. City of Atlantic City*, 532 F.3d 216, 236 (3d Cir. 2008).

For purposes of this appeal, we assume that publication of the LIS and the violations on the internet for the public to view has a sufficient and adverse effect or "threat" on the Facility's reputational interests to implicate due process concerns. *See Pennsylvania Bar Association*, 607 A.2d at 856-57.[6] Nonetheless, the LIS contains sufficient and detailed notice of the violations, and before the LIS is posted on the internet, the Department provides the Facility with the opportunity to protect its reputational interests. Particularly, the Facility can contest the violations by making comments in section 3 of the LIS, which is also posted on the internet and made available to the public. (F.F. at No. 5; R.R. at 1a-2a.) This predeprivational process is much more extensive than that in *Pennsylvania Bar Association*, where the attorneys were not even provided notice.

Because the Facility is afforded adequate notice and an opportunity to respond in writing, *Pennsylvania Bar Association* is distinguishable and is not dispositive authority on the present issue. Moreover, this Court in *Pennsylvania Bar Association* was primarily concerned that the lack of notice deprived the attorneys of the opportunity "to raise an objection to [the] listing." 607 A.2d at 857. For the reasons discussed below, we conclude that at this stage of the regulatory procedure, where the Facility's certificate of compliance is not being revoked (*i.e.*, the predeprivation stage), the opportunity to contest the violations in writing, in and of

---

[6] We also assume, without deciding, that the Facility, as a business entity, possesses the right to reputation in the same manner that an individual citizen does.

13

itself, is sufficient to preserve the Facility's right of reputation and minimize any "threat" to its reputation.

Indeed, in cases concerning the discharge of a public tenured employee, which often involve allegations of improper or criminal conduct, it has been held that pre-termination notice and an opportunity to respond in writing is enough to comport with due process. *See, e.g., Pavonarius v. City of Allentown*, 629 A.2d 204, 207 (Pa. Cmwlth. 1993) (discussing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 545-46 (1985)); *accord Matter of Richie v Coughlin*, 148 A.D.2d 178, 183 (NY App. Div., 3d Dept. 1989). In *Pavonarius*, this Court stated: "Only a meeting with the employer or a written notice sent by the employer to the employee setting forth the reasons for her termination and requesting the employee to respond in writing to the allegations is necessary to satisfy the [tenured employee's] basic due process rights." 629 A.2d at 207. The reason for this rule is that the predeprivation phase serves as "an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges . . . are true and support the proposed action." *Loudermill*, 470 U.S. at 545-46.

In cases analogous to the present scenario, the federal circuit courts of appeals have also concluded that notice and an opportunity to respond in writing satisfied the predeprivation prong of due process.

In *Agility Defense & Government v. United States Department of Defense*, 739 F.3d 586 (11th Cir. 2013), the United States Court of Appeals for the Eleventh Circuit concluded that government contractors had a liberty interest in not having stigmatizing allegations disseminated or publicized; this liberty interest was at stake when the agency suspended the contractors for multiple years due to an indictment for fraud; yet, the contractors were afforded procedural due process by

14

virtue of the fact that the contractors received notice of the suspension and had an opportunity to respond in writing. The court explained:

> [E]ven assuming that the suspension of the [contractors] deprived them of their liberty, the regulation does not violate the Due Process Clause because it contains constitutionally adequate procedures. An agency must immediately notify a suspended affiliate of its suspension by certified mail. 48 C.F.R. §9.407-3(c). That notification includes the basis of the suspension and advises the affiliate of its opportunity to respond in writing. *Id.* These procedures – notification and an opportunity to respond – are constitutionally adequate procedures for multiyear suspensions.

*Id.* at 591.

In *Northlake Community Hospital v. United States*, 654 F.2d 1234 (7th Cir. 1981), the United States Court of Appeals for the Seventh Circuit addressed a hospital's claim that it had been denied due process because its Medicare provider agreement was terminated prior to a hearing. In that case, the Department of Health and Human Services conducted several inspection visits and provided the hospital with notices of deficiencies, outlining the hospital's noncompliance with administrative regulations. In turn, the hospital had the opportunity to respond in writing to the notices and was given a grace period to correct the deficiencies. When the hospital failed to correct the deficiencies, the Department sent notice to the hospital that its Medicare provider agreement was terminated. The hospital then filed suit, alleging that the pre-termination procedures did not conform with procedural due process. The court disagreed, concluding that notice and an opportunity to respond in writing fulfilled the requirements of due process.

Similarly, in *Town Court Nursing Center v. Beal*, 586 F.2d 266 (3d Cir. 1978) (*en banc*), the Secretary of the Department of Health and Human Services

decided not to renew a nursing home's Medicaid provider agreement based upon regulatory violations found by health care inspectors. The Third Circuit concluded that the nursing home was only entitled to notice and an opportunity to respond prior to the non-renewal. In pertinent part, the court stated:

> [T]he decision not to renew a provider agreement is an easily documented, sharply focused decision in which issues of credibility and veracity play little role. It is based in most cases upon routine, standard, unbiased reports by health care professionals. Those professionals evaluate the provider in light of well-defined criteria that were developed in the administrative rule-making process. Written submissions are adequate to allow the provider to present his case. Given the extensive documentation that the provider is able to submit in response to the findings of the survey teams, the provider is unlikely to need an evidentiary hearing in order to present his position more effectively.

*Id.* at 277.

The reasoning and conclusions of the above cases apply here with equal force. The Department's agents are presumed to have conducted their inspections in good faith and in accordance with the law, *Office of Governor v. Donahue*, 98 A.3d 1223, 1239 (Pa. 2014); the regulations are relatively straightforward and lacking discretionary factors or standards; and the LIS constitutes reasonable grounds to believe that the violations were committed. In terms of the LIS, section 3 is located directly beneath the "Description of Violation" section, and the Facility is permitted to state in this section any and all reasons why it believes a violation is incorrect and also to "attach pages as necessary." (*See* R.R. at 1a, 4a, 15a.) Ultimately, by affording the Facility with the initial opportunity to dispute the violations in writing, the Department has provided the Facility with the ability to adequately protect its

16

reputation by responding to allegations concerning its operations. Therefore, we conclude that this predeprivation procedure comports with due process.

The Facility, nevertheless, takes issue with the fact that it must file a plan of correction after receiving the LIS and the Department may revoke its certificate of compliance if the plan submitted is not acceptable. At the outset, this Court is mindful of its duty to interpret a regulation in a constitutional manner if that is reasonably possible. *See Bricklayers of Western Pennsylvania Combined Funds, Inc. v. Scott's Development Co.*, 90 A.3d 682, 692 (Pa. 2014).

Notwithstanding the Facility's arguments, there is nothing in the regulations that prohibit the Facility from maintaining its position and stating on its plan of correction that no plan is needed because no violations have occurred. In such a situation, the Department will be forced to consider the Facility's written response to the LIS to determine whether the proposed plan of correction is "acceptable." 55 Pa. Code §20.52. If the Department decides that the plan is not, the Department may revoke the Facility's certificate of compliance. 55 Pa. Code §§20.71(3). Conversely, upon review of the written response, the Department may decide that the violations are not properly supported, and the regulations do not prohibit the Department from retracting or rescinding the LIS. In the event the Department revokes the certificate of compliance, the Facility will have the opportunity to appeal, and it will receive a full-blown postdeprivation evidentiary hearing before an ALJ and the Bureau, along with the right to seek further appellate review in this Court and the Supreme Court. *See generally Millcreek Manor v. Department of Public Welfare*, 796 A.2d 1020, 1028-30 (Pa. Cmwlth. 2002) (discussing the requirements for a full, *de novo* evidentiary hearing before an ALJ); *see also Rogers v. Pennsylvania Board of Probation & Parole*, 724 A.2d 319, 321-22

(Pa. 1999). Although the Department's regulations are silent on the latest matter, we must interpret them as allowing the Facility to litigate and contest alleged violations at a revocation hearing based upon an unacceptable plan of correction, or at any hearing where violations, both past and present, form the underlying basis (or part of the basis) for nonrenewal or revocation.

When the regulations are interpreted in this manner, the traditional administrative hearing and subsequent judicial review are more than adequate to satisfy the postdeprivation demands of due process. This procedure provides the Facility with a full and fair opportunity to vindicate its reputation and establish that the LIS is incorrect and/or that it did not violate the Department's regulations.

In *Department of Public Welfare v. Eisenberg*, 454 A.2d 513 (Pa. 1982), the Department suspended a doctor from participating in a welfare program based on allegations that the doctor maintained inadequate documentation and billed for unnecessary medical services. In the notice of suspension, the Department advised the doctor of his right to appeal to the Bureau. This Court held that the Department's procedures violated due process by failing to provide the doctor with a predeprivation hearing. On appeal, our Supreme Court reversed, concluding that due process was satisfied because the Department provided the doctor with a postdeprivation hearing. Significantly, our Supreme Court determined that "no pre-termination hearing is required" and that the doctor's "due process right has been met by a full administrative hearing accorded to [the doctor] before the [Bureau.]" *Id.* at 516 (citations omitted). *See also Cohen v. City of Philadelphia*, 736 F.2d 81, 86 (3d Cir. 1984); *accord Bello v. Walker*, 840 F.2d 1124, 1127-28 (3d Cir. 1988).

In *Segal v. City of New York*, 459 F.3d 207 (2d Cir. 2006), the government employer terminated an employee for inflicting corporal punishment

18

upon a student under her care and supervision. The court concluded that this allegation constituted a stigmatizing statement about the employee, calling into question her good name, reputation, and integrity, and that the employee was entitled to procedural due process. After balancing the employee's reputational interests and the employer's interest in making quick personnel decisions, the court concluded that a predeprivation hearing was not required and that a postdeprivation hearing was sufficient:

> Although a pre-termination hearing would provide [the employee] with the opportunity to refute any stigmatizing statements prior to her entry into the job market, such a hearing comes at too high a cost to the government. The government's important interests – in both explaining its employment decisions and exercising its right to terminate an at-will employee immediately – would be unduly impaired if we were to require a pre-termination hearing in such circumstances. . . .
>
> [T]he government is simply required to provide [the employee] with an opportunity to salvage her name. In our view, there is no reason to believe that this limited right – a meaningful opportunity to clear one's name – cannot be adequately vindicated at a reasonably prompt, post-termination name-clearing hearing.

*Id.* at 216-17 (citations omitted).

Finally, in *González-Droz v. González-Colón*, 660 F.3d 1 (1st Cir. 2011), the Puerto Rico Board of Medicine determined that a doctor was engaged in the illegal practice of medicine that posed a risk of harm to patients and suspended the doctor's medical license pending a hearing. Having no opportunity to respond to the suspension notice prior to the hearing, the doctor filed a complaint, contending that the lack of a predeprivation hearing violated his due process rights. The United States Court of Appeals for the First Circuit disagreed, reasoning as follows:

19

[W]e conclude that a prompt post-deprivation hearing was constitutionally adequate.

In working this calculus, we give great weight to the proposition that when the state reasonably determines that a license-holder poses a risk to patient safety, pre-deprivation process typically is not required. In these circumstances, moreover, the need for a pre-deprivation hearing is further diminished by the state's strong interest in upholding the integrity of a state-licensed profession. The Board's concern that [the doctor] "may harm patients" because he lacks the "training required by the [regulation] to carry out such procedures" provided a sufficient basis for a founded conclusion that no pre-deprivation hearing was constitutionally compelled.

Neither the possible risk of an erroneous deprivation nor the possible benefit of additional safeguards shifts the balance. Especially in cases involving public health and safety and the integrity of professional licensure, the force of these factors is significantly diminished by the ready availability of prompt post-deprivation review.

*Id.* at 14 (citations, brackets, and most quotations omitted).

*Eisenberg*, *Segal* and *González-Droz* collectively establish that when an individual is deprived of a reputational interest, a postdeprivation administrative hearing to refute the allegations typically satisfies the demands of procedural due process.

Here, the Department and the Commonwealth have an overwhelming interest in ensuring that prompt action is taken when an agent observes that a licensed child residential treatment center has violated the Department's regulations. *See also Northlake Community Hospital*, 654 F.2d at 1242. Through legislative delegation, the Department has determined that any violation of the regulations threatens the safety and health of children. *See* 55 Pa. Code §3800.1. Given the circumstances of this case, a predeprivation hearing is not necessary and a postdeprivation hearing

fulfills the requirements of due process. *See also Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983) ("[T]here is no denial of due process in refusing to grant a full adversary hearing before taking away property or liberty, so long as such a hearing is provided later . . . and there is justification for the delay. When a child's safety is threatened, that is justification enough for action first and hearing afterward."). Our interpretation of the regulations above mandates that such a procedure be available to the Facility.

*   *   *

On one hand, the Department and the Commonwealth have a paramount interest, when compared to the Facility's asserted interest, in ensuring the health and safety of dependent and delinquent children who reside in a child residential treatment center. It would be unduly burdensome to compel the Department to conduct an evidentiary hearing for every violation in an LIS before requiring a facility to take remedial action. As noted above, a facility has the right to dispute the violations in the LIS and is free to assert its compliance in its plan of correction. True, in doing so, the Facility may risk the revocation of its certificate of compliance, but it will nonetheless receive the full panoply of due process protection that goes along with a prompt, administrative evidentiary hearing and subsequent judicial review. In the event the Facility opts instead to submit a suitable plan of correction, and the violations in the LIS are used in the future as a basis for revocation or nonrenewal, the Facility will have same opportunity to challenge the validity of the initial violations. Regardless of any delay or length of time that may pass from when the Facility affirmatively decides to challenge the violations at a revocation or nonrenewal hearing, the fact that there is a comprehensive and adequate procedural

21

mechanism available to it suffices for purposes of due process. *See United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in United States Currency*, 461 U.S. 555, 568-69 (1983); *Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 682 (3d Cir. 1991).

On the other hand, we have assumed that the Facility has a liberty interest in its reputation and that this interest may be impaired if an unfounded LIS is publicized. Given the procedural safeguards detailed above, this interest is adequately protected at all stages of the regulatory process because the Facility will eventually have the opportunity to contest a violation at an administrative hearing and seek judicial review. *See Nnebe v. Daus*, 644 F.3d 147, 159 (2d Cir. 2011). On this note, the Facility's reliance on *Clayton* and the irrebutable presumption doctrine is misplaced. Any presumption concerning an alleged violation is not conclusive, and, under the regulatory scheme, the Facility has the opportunity to disprove the violation. *See In the Interest of J.B.*, 107 A.3d at 37 (stating that a presumption is not irrebuttable when the party has the opportunity to rebut or contest the validity of the presumption); *Commonwealth v. Aziz*, 724 A.2d 371, 374-75 (Pa. Super. 1999) (same). In the meantime, the Facility's ability to respond to and contest the violations in writing is enough to protect its reputational interests from being unnecessarily impaired until adverse action is taken against the certificate of compliance and the Facility challenges the violations at an evidentiary hearing before the ALJ and the Bureau. Therefore, we conclude that the Facility's due process rights have not been violated.

**Any argument that the LIS is an appealable adjudication is waived**

Before concluding, we note that in its principal brief, the Facility does not argue that it has a statutory right to appeal. Therefore, this argument is waived. *Jimoh v. Unemployment Compensation Board of Review*, 902 A.2d 608, 611 (Pa. Cmwlth. 2006). For the first time in its reply brief, the Facility suggests that the LIS constituted an "adjudication" under the Administrative Agency Law, 2 Pa.C.S. §§501-508, 701-704. However, "Pennsylvania Rule of Appellate Procedure 2113(a) precludes an appellant from raising a new issue in a reply brief." *Borough of Glendon v. Department of Environmental Resources*, 603 A.2d 226, 258 (Pa. Cmwlth. 1992).

In any event, an "adjudication" is defined as: "[A]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceedings in which the adjudication is made." 2 Pa.C.S. §101. Although the Facility maintains that the letter was a "final decision," our analysis above establishes that subsequent procedural avenues are available to the Facility to contest the violations in the LIS. *See Citizens Coal v. Department of Environmental Protection*, 110 A.3d 1051, 1059 n.15 (Pa. Cmwlth. 2014) (collecting cases and stating that a letter informing a coal company that it must compensate the Commonwealth was not an adjudication where the letter was merely "one step in a continuing multi-step process").

Moreover, in *Sunbeam Coal Corp. v. Department of Environmental Resources*, 304 A.2d 169 (Pa. Cmwlth. 1973), an administrative inspector issued a coal company notices of violations following an inspection of the premises. The statutory scheme provided the coal company with thirty days to correct the violations;

23

if the coal company failed to make the corrections, the agency, after a hearing, could suspend its license or issue a cease and desist order until the coal company came into full compliance. In *Sunbeam Coal Corp.*, the coal company attempted to file an immediate appeal upon receiving the notices of violations. However, this Court dismissed the appeal, holding that "[c]learly, . . . the notices here were not adjudications[.]" *Id.* at 171. *See also NHS Human Services of PA v. Department of Public Welfare*, 985 A.2d 992, 993-96 (Pa. Cmwlth. 2009); *Fiore v. Department of Environmental Resources*, 510 A.2d 880, 881-83 (Pa. Cmwlth. 1986).

Because the Facility waived any argument that the LIS is an appealable adjudication, we need not determine whether our holding in *Sunbeam Coal Corp.* is applicable in this case.

## Conclusion

After considering the private and governmental interests at stake, as required by *Mathews* and *R.*, we conclude that the predeprivation and postdeprivation procedures explained above comport with the due process clauses of the United States and Pennsylvania Constitutions. We further conclude that the Facility waived any argument that the LIS constitutes an appealable adjudication under the Administrative Agency Law. Accordingly, we affirm the Bureau's February 2, 2015 order.

As a final matter, after considering the application to strike brief filed by the Facility, it is denied.

 

 

_____

PATRICIA A. McCULLOUGH, Judge

24

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Summit Academy,                :
                Petitioner        :
                                   :   No.  257 C.D. 2015
          v.                         :
                                   :
Department of Human Services,      :
                Respondent        :

## *ORDER*

AND NOW, this 7th day of December, 2015, the February 2, 2015 order of the Department of Human Services, Bureau of Hearings and Appeals, is affirmed.

The application to strike brief filed by Summit Academy is denied.

 

 

_____
PATRICIA A. McCULLOUGH, Judge